Williams, Judge,
delivered the opinion of the court:
This suit is brought under the jurisdictional act of May 24, 1924, 43 Stat. 139, which confers jurisdiction upon the Court of Claims to hear, examine, adjudicate, and render *248 judgment “ in any and all legal and equitable claims arising under or growing out of any treaty or agreement between the United States * * * ” and the plaintiff Indians, “ or arising under or growing out of any act -of Congress in relation to Indian affairs * * * ” which “ have not been heretofore determined and adjudicated on their merits by the Court of Claims or the Supreme Court of the United States ”, excepting only “ the so-called lojral Creek ” claims or any claims with reference to the equalization of allotments heretofore made to the members of the Creek Nation.
This act was subsequently modified by a joint resolution,. 44 Stat. 568, permitting plaintiff to bring separate suits on one or more causes of action, and by the act of Congress approved February 19, 1929, 45 Stat. 1229, the time of filing such suits was extended to June 30, 1980. This is one of a series of suits brought by plaintiff under the jurisdictional act as modified.
The plaintiff seeks to recover the sum of $20,504,592, the asserted 1831 value of 2,181,200 acres of land lying in the State of Alabama. The claim >is based on the alleged failure of the United States to fulfill its obligations under the treaty of March 24, 1832, 1 Stat. 366, which treaty is. set out in full in Finding IY. The articles of the treaty material to the claim, briefly summarized, are:
Aet. I. The Creek Tribe of Indians cede to the United States all their land lying east of the Mississippi River.
Aet. II. The United States engage to survey the said land as soon as the same can be conveniently done; and when the same is surveyed, to allow ninety principal chiefs, of the tribe one section, and every other head of the Creek family one half-section each; which tracts shall be reserved from sale for their use, for the term of five years, unless, sooner disposed of by them.
Aet. III. Those tracts may be conveyed by the persons, selecting the same to any other persons, for a fair consideration, in such manner as the President may direct. The contract shall be certified by some person appointed for-that purpose by the President, but shall not be valid till the President approves the same.
*249 A t?t IY. At the end of five years all the Creeks entitled to these selections, and desirous of remaining, shall receive-patents therefor in fee simple from the United States.
ART. Y. That all intruders upon the country ceded shall be removed therefrom in the same manner as intruders may be removed by law from other public land until the country is surveyed, and the selection made, excepting such white-persons ¿vho have made their own improvements, and have-not expelled the Creeks from theirs, who may remain until their crops are gathered. The article not to operate upon, that part of the country not included in the selections after they have been made. But intruders shall be removed from the selections for a period of five years, or until they are-conveyed to white persons.
Art. VI. In addition to the individual reservations provided for in article II, twenty-nine additional sections may be located, and patents for the same shall issue to such Creeks to whom they may be assigned by the Creek Tribe.
Other articles of the treaty relate to the desire of the Government that the Creeks should remove to the country west of the Mississippi Elver, contain guarantees as to the country-assigned to them in the West, and provide for certain cash payments by the United States to the Creeks. The provisions of those articles are not involved in suit and need not be discussed.
The claim is based upon the alleged failure of the United States to fulfill its obligations under the articles of the-treaty providing for the locating of members of the tribe on individual reservations, and the sale of such reservations by them. It is contended that the Government did not remove the intruders from the country ceded as it was bound to do. by article Y of the treaty, and that failure to remove the intruders made the performance of other articles of the treaty, particularly articles II and III impossible; that the-presence of the intruders created a virtual state of anarchy within the territory ceded, making it impossible for the-locating agents to properly locate the Indians on their reserves, and resulting in the perpetration of great frauds; upon the Indians in the sale of their lands. It is- contended *250 that a majority of the contracts of sale were procured through fraud and deception and were void, and that it being impossible to separate the valid sales from the void ■sales, fraud should be presumed in all cases, and that the Government should be held liable to the plaintiff for the value of the entire reserves, amounting to 2,187,200 acres, ■except as to such sales as the proof shows the owner received the fair consideration provided in article III of the treaty. The prayer of the petition is:
“ That this court regard the President as having done his ■duty under said act of March 3rd, 1837, and as having sold said 2,187,200 acres of land for the benefit of plaintiff, and .as having converted the same into a trust fund for the benefit of its citizens.
“ That defendant have credit only for such amount of the proceeds of the sales of said land as it can establish, by ■clear and satisfactory proof, was disposed of under the terms of said treaty, and for which the owner received the fair consideration,’ provided for in said treaty.
“ That this court render judgment in favor of plaintiff for the amount so found to be due it, and that interest at ‘the rate of 6% be given plaintiff on such trust fund, from ¡the date this court finds it should have been established.”
The treaty grew out of the desire of the Federal Government to remove the Creek Indians to a country west of the Mississippi River. By virtue of a treaty negotiated in 1826, the Creek Nation had ceded its lands in the State of Georgia to the United States in exchange, among other considerations, of the promise of ample territory for a home for the tribe west of the Mississippi River. A part of the tribe had migrated to the new country and was living there ■at the time the treaty of 1832 was negotiated. The remainder ?of the tribe was then living within the State of Alabama,■occupying a territory of about 5,200,000 acres. This territory was ample for agricultural purposes but the Indians being indolent and poor farmers, and the game upon which they had formerly largely subsisted being almost exterminated, found themselves in a state of destitution. Their situation was also made more difficult by the fact that the ■State of Alabama had recently laid out the Creek country Into two counties and had extended its laws over them. *251 They were no longer able to live in accordance with their own tribal laws and customs. The whites were crowding upon them, resulting in frequent clashes between the races. The protection afforded by the State of Alabama to white settlers in the Creek territory made it most difficult for the Federal Government to adequately protect the Indians in the enjoyment of their rights and homes. Because of these conditions, and for the best interests of the Indians themselves, the Federal Government exerted every effort to induce the Creeks to enter into a treaty ceding their Alabama lands to the Government and removing to the new country in the West. The Indians were reluctant to cede their land and, in the main were very much opposed to removing from their then territory. Finally the treaty of March 24, 1832, was negotiated in which the Creeks ceded all their lands east of the Mississippi Eiver to the United States. The Indians refused to negotiate on any basis other than the allotment of individual reserves to their chiefs and to the head of each Greek family. The commissioners who negotiated the treaty on the part of the Government foresaw the dangers, both to the Indians and to the Government, of the inclusion of this provision in the treaty, and expostulated in vain against it, but the Indians considered it the most important consideration in the treaty to them, and without the provision would not enter into the treaty. Following the execution of the treaty, and before the survey of the ceded territory had been completed, the Government made an unsuccessful effort t-o negotiate a further treaty with the Creeks upon the basis of the recognition of the right of individuals of the Nation to the separate sections and half-sections of land •agreeable to article II of the treaty; that these should be •ceded to the United States, and that the Government would obligate itself to bring them into the market at an early day, .and to pay to each individual entitled to a section or half-section under the treaty of 1832, whatever his particular section or half-section should be sold for. The Creeks, as they had a right to do, refused to enter into such a treaty.
Article V of the treaty provided that intruders upon the lands ceded should be removed therefrom in the same *252 manner as intruders may be removed by law from other public land until the country was surveyed and the selections made, excepting such white persons as had made their own improvements and had not expelled the Creeks from theirs, such persons being permitted to remain until their crops were gathered. Because of the conditions shown in finding VI, the Government did not remove the intruders, and they remained upon the land ceded during the time it was being surveyed and the selections made of individual reserves. If does not appear, however, that the failure to remove these persons interfered seriously either with the survey of the land or the location of individual reserves to the Indians. No complaint from any source was made as to the survey or the time and manner in which it was made. The individual reserves Avere located by the agents of the Government in the manner directed in article II of the treaty. The ninety principal chiefs were satisfied with their locations, and Avhile a feAv complaints were made that individual reservees entitled to a half-section each were not given the particular land they were entitled to receive, comparatively few of these complaints came from the Indians themselves. Colonel Abert, in a communication to the Secretary of War, October 15,1834, more than six months after the location of reserves had been completed, stated that the record showed less than 50 cases of complaint, and that of these cases every one well founded had been corrected. While there was much loose talk from speculators and others that certain Indians had not been properly located, the record of the case justifies the conclusion that Colonel Abert’s statement was substantially correct. Plaintiff’s contention, therefore, that the failure of the Government to remove the intruders made the carrying out of the terms of the treaty an utter impossibility is not sustained in so far as article II of the treaty is concerned.
Article III of the treaty provides for the sale of individual reserves to other persons for a fair consideration, in such manner as the President may direct, the contract of sale to be certified by some person appointed for that purpose by the President, but not to be valid until approved by the President.
*253 The territory was divided into four districts and agents were designated in each district to certify contracts of sale. The certifying agents began their work as soon as the locations were completed.
Those charged with the Execution of the treaty on behalf of the Government realized that every safeguard possible for the protection of the Indians would have to be thrown about the sale of their reserves. It was realized that their ignorance, their entire lack of business experience, and their incapacity justly to appreciate the true value of property, would make them helpless in the hands of designing and unscrupulous purchasers. Foreseeing these dangers, most rigid rules governing the certification of sales were promulgated by the War Department in October 1833. (Finding IX.) These rules were amplified on December 18, 1833, before the certification of sales began, by the requirement that the contract of sale must have been entered into subsequent to the location of the reservation, and that the purchase price must be paid in the presence of the approving agent, except in “ the very few ” cases where the Indian was prevented by illness or inability from appearing before the agent, which cases were required to be proved by the most unexceptional evidence.
Notwithstanding these rigid regulations, and it is difficult to conceive how greater prudence and caution could have been exercised by the Government in approving and certifjr-ing sales, it became manifest soon after the certifying of contracts started that frauds were being perpetrated on the Indians. Complaints of these frauds were received by the War Department from certifying agents, from certain of the Creek chiefs, from citizens residing in the vicinity •of the lands being sold, from speculators, and others. The -character of the complaints, the manner in which they were investigated by the War Department, and the efforts made to correct frauds when discovered, and to prevent their continuance in the future, are fully set out and disclosed in the findings and need not be repeated in detail here. The investigations revealed that many fraudulent practices had been resorted to by purchasers in procuring contracts of sale, the two principal methods through which most of the frauds *254 were consummated being: (1) By taking the true Indian owner of a reserve before the agent, presenting a contract of sale for a fair consideration, paying the purchase money to the Indian in the presence of the agent, the money so paid being afterwards obtained from the Indian by fraud or force of the pretended purchaser, and (2) by taking an Indian who had sold his land, or had never owned any, before the agent and having him impersonate the real owner of a reservation, and thereby procure the certification of a contract of sale, thus deceiving the agent and defrauding the real owner of the reservation, the wages usually paid the impersonating Indian ranging from $5 to $10.
The extent to which the Indian reserves were defrauded out of the money received from the sale of their lands by the method first mentioned was not disclosed during the investigations, and from the very nature and variety of the fraudulent devices resorted to was impossible of ascertainment. However, the record leaves no room for doubt that in many cases where contracts of sale covered a fair consideration, and the consideration shown was actually paid to the reservees in the presence of the agent, the money so paid, or a large part of it, was subsequently taken back by the purchaser through force or fraudulent practices. Meigs in his report to the Secretary of War, dated June 11, 1834, said:
“The impositions are not practised in the making and the consummation of the contracts, but after the purchase money has been paid. As soon as this is done, the Indian is enticed into a room — and it is said, for the most part, by the purchaser himself — where he is plied with whiskey, till he is gotten into a humor to be wheedled out of his money by a loan or otherwise. Next morning he is-found dead drunk in the street, rifled of his money, except in most instances a few dollars; and the report is at once-put in circulation, that he has been robbed of, or has lost it. These are the reports, and I have them from respectable men directly from the scene of action, who add the frauds committed are incredible, and to be believed need to be seen.”
It was not within the power of the Government to protect the Indians from such fraudulent and deceptive practices, nor was there any liability on the part of the Government *255 growing out of the treaty to do so. The Indians, under the treaty, had the right to dispose of their reservations. The Government, under article III of the treaty, obligated itself to protect them in the disposal of their reserves to the extent that they received a fair consideration for the same. The Government prohibited the sale of lands for less than, in the opinion of the certifying agents, they were worth, and saw to it that the Indians in all cases received the contract, consideration for their lands. When the Government did this it did all that it could do, or that it was obligated to do, under article III of the treaty. What disposition individual Indians selling reserves made of the money received by them, subsequent to its receipt, was beyond the reach of the Government. The land belonged to the Indians and the money received by them from its sale was theirs, and after the money was paid to them and the conveyance-approved, the Government had discharged its full obligation to the plaintiff under article III.
The second method through which frauds were consummated, that of having another Indian imxiersonate the real owner of a reservation in procuring a certification of a contract of sale, did not become general until about the middle of February 1835, more than a year after the certification of sales began. Commissioner Alfred Balch, in a report to the-Secretary of War on January 14, 1837, said:
“ Although many frauds were perpetrated throughout the year 1834, of the existence of which the agents were apprized, still it was difficult to detect and defeat them. Those who were engaged in plundering these unlettered savages were emboldened by success, and early in 1835 a. plan was concocted to sweep off from them all the reserves that remained uncertified, amounting to more than fifteen hundred.”
Eli S. Shorter, one of the most notorious and brazen of those engaged in procuring contracts from Indians, on March 1, 1835, wrote a letter to certain of his associates in which, after outlining the fraudulent method of impersonation then being used to obtain contracts, he said:
“ We shall go into the strife, and do what we can. If you will join us, well; if not, well. We have plenty of money- *256 You need not come unless you will drill your Indians, and prepare them to receive $10 in the store for every contract ■certified. * * *
“ The whole show will be up in four weeks from this time, and all the Indians who do not sell will lose their lands. This system has not been working more than three weeks, .and upwards of 1,000 tracts have been certified.” (Italics .supplied.)
Meigs, who was commissioned by the President to investi.gate the complaints of frauds perpetrated upon the Indians in the sale of their lands, in a report to the Secretary of War, November 12, 1834, said:
“ Feeling that the President’s preparedness to acquit himself of his high responsibilities touching these sales, depended upon the fidelity of my examination, I have .given the subject a patient and anxious attention, proportioned to its delicacy. * * * The frauds complained of .admit of the following classifications:
“ 1. The reservees have sold, in some instances, without ever having seen their lands, believing that they never would be shown them, and fearing that none had been .assigned them.
“ 2. Some have been pursuaded to sign a paper to enable a pretender friend to guard them against being cheated, which paper was nothing less than a deed. They have been induced to have these papers certified by the representation, that they would not answer the avowed purpose without the agent’s certificate. And they have been pursuaded, when the agent should put the question — ‘ Have you sold your land ? ’ — to answer affirmatively, as this was a mere formal question, which the agent must ask.
“ 3. In many cases, the reservee’s signature has been procured while he was drunk, a few dollars in cash or goods being given him to bind the bargain, and when sober, he has been made to believe, that when an Indian puts his hand to paper, he is obliged to have it certified.
“Note. — In Dr. McHenry’s office, if the person who procures a signature enters his name on the books as a purchaser, the Indian is not permitted to sell to any other nor are others permitted to bid. This is the main engine by which the purchaser is enabled to convince the Indian that he is bound to consummate a contract when his signature has been once procured. And that it is a most powerful ■engine of fraud, a man must be excessively blind not to perceive.
*257 “ 4. Some reservees have been allured by all those means usually resorted to, to contract debts in the stores, and then frightened by threats of imprisonment, etc., to sign deeds-for the sale of their lands for insufficient prices.
“ 5. Some have sold for inadequate prices on promises-that they should have what the land should be valued to; and then the purchaser procures a valuation to be made by his own tools.
“ 6. The money delivered to the Indian in the presence of the agent has been taken back by the purchaser by violence- or fraud, and always secretly.”
The fact that this able and careful investigator, after having spent months in the investigation of complaints of fraudulent sales, should in his final report omit from his-classification of the frauds complained of, that of the impersonation of the real owner of a reserve by another, is-conclusive proof that up to that time such fraudulent practices had been negligible. When it is considered that a large majority of the reserves had been sold at that time,, and that the sales had been approved and certified to the-President by agents designated for that purpose, and that-many other sales were approved and certified between that-time and February 1835 when wholesale frauds by impersonation were begun, and when the uncertified sales-amounted to only about 1,500, and that many valid sales were made and approved between February 1835 and April 28, 1835, when the certifying of contracts was temporarily suspended, and that many valid sales were made and approved after the certifying of contracts was resumed in September 1835, it is clear that a comparatively small percent of the total contracts of sale were procured by the fraudulent impersonation of the true owners of reserves, and these sales, as will hereafter be- seen, were reversed and set aside.
When complaints reached the War Department in the-spring of 1835, that wholesale frauds by impersonation were being perpetrated upon the Indians in the sale of their lands, the certifying of contracts was suspended and. a thorough-going investigation of the alleged frauds instituted by the Government. The investigation was con *258 ducted by the certifying agents, by Col. John B. Hogan, and others designated for that purpose. The widest possible publicity was given throughout the various certifying districts that such an investigation was to be made. The chiefs of the various towns were requested to have all their people who complained that their lands had been “ stolen ” appear before the agents, at designated dates and places, with the assurance that whatever frauds were found to have been committed would be corrected. Purchasers were also notified of the time and place of the hearings, •and were requested to bring forward the Indians from whom they had made purchases. The investigations were prose•cuted vigorously until May 28, 1836, when the work w,as terminated by the War Department because of the outbreak of open hostilities on the part of the Indians. The investigation disclosed widespread frauds had been perpetrated. Many contracts were voluntarily given up and surrendered for cancellation by pretended purchasers; many contracts were reversed or cancelled because of the .failure of the pretended purchaser to appear before the agents when notified to do so; many others were reversed and set aside by the agents on the testimony presented at the hearings; others were found to be valid sales. However, the record does not disclose the number of alleged fraudulent sales investigated, nor what percent of the contracts considered were determined to have been fraudulent. Complaints of fraud arose principally in the district where Dr. R. W. McHenry was the certifying agent. Colonel Hogan, in a communication to the War Department, dated March 11, 1836, reported 656 fraudulent contracts in that district, being nearly one third of the whole number of reserves allotted in the district. Of this number, 369 represented cases in which (1) the purchaser did not appear in response to the notice given, and (2) those in which the pur'Chaser appeared but failed to bring the Indian of whom he purchased, or adduce sufficient evidence to support the validity of his contract; 205 represented cases — those given up — in which purchasers, in the presence of the agent, agreed to surrender their contracts; 43 represented cases in *259 which the ground for reversal was not stated; 37 represented cases supported by special reports and affidavits; and 21 were cases from another district. These cases, except the 205 representing contracts given up by the pretended purchaser, were returned to Colonel Hogan for further investigation and a more specific statement of the reasons assigned for reversal. Hostilities on the part of the Indians breaking out shortly thereafter, Colonel Hogan’s work terminated without his having made the supplemental report requested.
Following the Creek hostilities in 1836, T. H. Crawford and Alfred Balch were appointed commissioners, under a resolution of the House of Representatives, to investigate frauds in the sale of Creek lands in Alabama. These conn missioners began their investigations in September 1836, ■and made their final report in May 1838. Their reports 'confirmed the findings of Colonel Hogan and previous investigators that many glaring frauds had been perpetrated upon the Indians in the sale of their lands. They investigated and adjudicated more than a thousand cases, and made recommendations in regard to them. The record of the case before us does not disclose the identity of the cases considered and passed upon, nor how many were found to have been fraudulently procured. Neither does it appear what action was taken by the Government in respect to their recommendations in the various individual cases investigated. They each, however, in separate reports attest the correctness of the findings made by Colonel Hogan in his report in March 1836 in which he recommended the reversal of 656 contracts of sale because of their fraudulent procurement.
In response to- a resolution of the House of Representatives, the Commissioner of the General Land Office on May' 30, 1848, made a report showing that 185 reservations were undisposed of at that time. Of this number 118 were reservations which had been sold, the sales of which had not finally been acted upon, and 67 were reservations that had never been sold. Of the 118 sales upon which final action had not been taken 25 were contracts which had been recommended for reversal by the commissioners. Many of the *260 remaining 93 cases had been recommended for confirmation by the Secretary of War upon the payment of additional sums found to be due. Several others were cases where approval of the contracts had been recommended by the investigating commissioners upon a like additional payment. In transmitting the report of the 185 cases undisposed of, the commissioner said:
“ In relation to the claims now on file, and not finally disposed of, it may not be improper to state that the office intends to select from them those to which no objection appears, with a Anew of submitting them for confirmation.. Those which have received a favorable consideration by the department, but the conditions on which their approval depends have not been complied with, the parties or their agents will be notified that, unless the claims are perfected, by the payment of the purchase money within a reasonable time Avhich will be named, the lands will be regarded as unsold by the Indians, and be disposed of at public sale under the law of 1831.”
Article III of the treaty makes the contract of sale of the individual reserves valid upon the approval of the President. If it be held that the plaintiff is entitled to recover because of frauds practiced upon its individual members in the sale of their reserves, the maximum possible liability of the Government Avould be the value of 118 reserves. The court must assume, and does assume, that the President of the United States performed his duties under the treaty and that all contracts of sale approved by him Avere valid. While the record leaves no room for doubt that most dastardly frauds by impersonation were perpetrated upon the Indians in the sales of a large part of the reserves, the conclusion is justified, and we think inescapable, that because of repeated investigations prosecuted by the Government these frauds were largely eliminated. The investigations were conducted by able and fearless men and were most thorough. Every possible effort was exerted by them to have individual reservees who claimed they had been defrauded to present their claims. Chiefs of the nation were invited to bring to the attention of the investigators all claims of fraudulent practices upon the Indians, *261 and were assured all claims would be considered and justice done. Hundreds of contracts upon investigation were found to have been fraudulently procured and their cancellation recommended by the investigating agents. While the identity of the particular cases investigated and found to have been fraudulent, and the final action of the Government on the agent’s reports recommending the reversal of .such cases are not disclosed, it is manifest their recommendations were in the main followed and new contracts of sale were made, certified to the President, and approved by him.
• Under the provisions of article Y of the treaty of August 7, 1856 (finding XIN), the Creek Nation released and fully discharged the United States from all claims and ■demands whatsoever which the Creek Nation or any individual thereof then had, except—
* *. ^ie 0f such individuals among the Creeks as have not received it to the compensation in money provided for by the act of Congress of March three, eighteen hundred thirty-seven, in lieu of reservations of land to which they were entitled, but which were not secured to ■them under the said treaty of eighteen hundred thirty-two; the right of the reservees under the same treaty who Mid not dispose of their reservations to the amounts for which they have been or may be sold by the United • States; * *
The act. of March 3, 1837 (finding XVI), authorized the President to cause all the reserves belonging to the Creek Indians by virtue of the treaty of 1832, which remained unsold on the 4th day of April, 1837, to be sold at public auction in the Creek country, and to cause patents to be issued to the purchasers of said reserves. By section 2 of the act the President was authorized to confirm the sales ’by the widow, the widow and children, the children, or the lawful administrator of Creek Indians who had died prior to April 4, 1837, without having legally disposed of their reserves and received the purchase money, or such portions of it as may not have been paid to the persons entitled to it, and to cause patents to be issued therefor to the pur..chasers. Section 3 authorized the President to pay the *262 persons entitled thereto the money which may be received from the purchasers of reserves under the authority given, under sections 1 and 2. Section 4 of the act made it lawful for the President to cause the sum of $1.25 per acre to be paid to the Creek Indians whose names were omitted to be entered upon the census roll, and those whose names appear on said roll but for whom no locations have been made, who shall appear, from proper evidence, to be justly entitled to reservations under the provisions of the treaty of 1832..
Pursuant to section 1 of the aforesaid .act, and subsequent to the report of the Commissioner of the General Land Office of May 30, 1848, certain Creek reservations were disposed of at public auction and the sum of $54,109.06 was paid to 228 individuals of the Creek Nation. Pursuant to section 4 of the act, the' amount of $86,800 was appropriated to pay the Creek Indians whose names had been omitted from the census roll taken pursuant to the treaty of March 24, 1832, and those whose names appeared on said roll but for whom no reservations had been located. This amount was paid to 217 individual Creek Indians in amounts of $400 each.
The plaintiff is not seeking to recover the compensation in money, provided in section, 4 of the act of 1837, in lieu of reservations individual members of the tribe were entitled to receive but which were not secured to them. Under the reservations of article V of the treaty of 1856, its right of recovery comes down to “ the right of such members of the tribe as did not dispose of their reservations, to the amounts for which such reservations may have been sold by the United States.” The details of these sales are not a matter of record. There is no evidence from which it can be ascertained whose lands were sold, or the amounts received fr-om the sales of individual reservations, or the names of the individuals to whom the proceeds of the sales were distributed. There is no proof upon which a finding can be based that any particular reservee received a less amount from the-Government from the proceeds of the sale of his lands than the United States received for the same. The burden of proof is upon the plaintiff upon this, as upon every other *263 phase the case. It has failed to establish that the proceeds; of the sales of unsold lands under the provisions of section 1 of the act of March 3, 1831, have not been accounted for to the persons entitled to receive the same.
The Creek Nation as a tribe expressly waived all tribal claims and demands against the United States in the treaty. of 1856. It has no legal or equitable claim of any kind or’ character against the United States growing out of the-treaty of 1832. It also, in the treaty of 1856, released and discharged the United States from all claims and demands-whatsoever that any individuals of the tribe then had against the United States, except those claims heretofore-mentioned, upon which, as we have seen, no legal liability against the United States has been established.
The plaintiff, therefore, is not entitled to recover either for itself as a nation or tribe, or for the use and benefit of' any individual members of the tribe.
The defendant challenges the right of the plaintiff to maintain its suit on the ground (1) that the matters and things alleged in the petition constitute claims of individual Indians, and in no way relate to or bear upon any claim which the Creek Nation or tribe may have against the United States, and, (2) that the jurisdictional act of May 24, 1924,, under which the suit is brought, does not confer jurisdiction upon this court to adjudicate the rights of individual members of the Creek Nation.
This defense was raised by demurrer at the inception of' the suit, at which time it was overruled without prejudice.. We have considered the question but do not deem its determination necessary to the decision of the case. The suit grows out of a treaty one hundred years old. For almost; a century the Creek Nation, generation after generation, has; persisted in the belief that the United States did not fulfill its treaty obligations to the individual members of the tribe entitled to reservations under the treaty of 1832, and it has; persistently throughout the years pressed the Government for an adjudication of its claims. The record of the case is; voluminous and contains all the available testimony obtainable bearing upon the facts involved. Both the plaintiff.' *264 and the defendant have gone to great expense and devoted .much time and labor to the preparation of the case. We think both the plaintiff and the Government are entitled to ■a decision upon the merits. It is apprehended that if the ;present jurisdictional act be held not broad enough to authorize the plaintiff to maintain suit for the use and benefit of individuals of the tribe, an amendment to the jurisdictional .act could, and would, be easily obtained. We have, therefore, assumed in our discussion of the case that the juris"dictional act authorized the plaintiff to bring and maintain •.suit for the use and benefit of individual members of the i tribe, although we do not now decide that question.
The petition is dismissed. It is so ordered.
Whaley, Judge; Littleton, Judge; and Green, Judge, .concur.
Booth, Chief Justice, took no part in the decision of this -case on account of illness.