Wiiitaker, Judge,
delivered the opinion of the court:
On December 27,1937, the plaintiff filed its amended petition suing to recover the value of 2,397.71 acres of its land which it alleges the defendant took from it without compensation, and which it gave to the Seminole Nation. However, in its reply brief filed on April 5, 1941, plaintiff says that but 1,198.99 acres of its lands were taken, and it asks judgment for the value of only so many acres.
The alleged taking is said to have occurred in this way: The defendant on February 14, 1881, purchased from the Creek Nation 175,000 acres of its lands immediately east of the so-called “Creek dividing line,” bounded on the south by the Canadian Eiver, and on the north by the North Fork thereof. The plaintiff alleges that in surveying this 175,000-acre tract the defendant ran the eastern line thereof at such a distance from the “Creek dividing line” as to include 176,198.99 acres instead of 175,000 acres; and that all of these 176,198.99 acres have been allotted and patented to members of the Seminole tribe. The first issue in the case is whether or not the area so surveyed did in fact contain more than 175,000 acres, and if so, how much more.
I
The acreage in question was purchased by the Secretary of the Interior pursuant to the act of March 3, 1873 (c. 322, 17 Stat. 626), which act in its preamble recites that the Creek Indians had ceded to the United States “the west half of their entire domain, to be divided by a line running north and south,” and that—
* * * the recent survey of said line, made in conformity with the provisions of said treaty, includes within the limits of the Creek reservation east of said line some of the improvements made on a reservation selected on what was supposed to be the Creek ceded lands for the Seminole tribe of Indians.
*566 In view of the facts recited, the Secretary of the Interior was authorized to purchase from the Creeks—
* * * such portions of their country as may have been set apart in accordance with treaty stipulations for • ■ the use of the Seminóles, * * * found to be east of the line separating the Creek ceded lands from the Creek reservation.
Pursuant thereto, the Secretary of the Interior entéred into an agreement with the Creek Nation, which, after reciting the portion of said act just quoted, provided in part as follows:
And the said Creek delegation do hereby' agree, for and on behalf of said nation, that they will cede to the United States, and do hereby cede, a strip of land in the Indian Territory, now occupied by the Seminole Nation of Indians, lying east of the said line dividing the Creek lands from the lands ceded to the United States in the treaty of June 14, 1866; bounded on the north by the North Fork of the Canadian River; on the south by the Canadian River; on the west by the dividing line between the Creek Reservation and the lands ceded under treaty of 1866 above noted; and on the east by a line running north and south between the rivers named, so far east of said division line as will comprise within said described boundaries one hundred and seventy-five thousand (175,000) acres, * * *
The survey of the line referred to in the Act was that made by Frederick W. Bardwell in 1871 and approved by the Secretary of the Interior February 5,1872; and the line referred to in the agreement dividing the Creek lands from those ceded to the United States is the line as surveyed by Bardwell. Plaintiff conveyed to defendant 175,000 acres east of this line.
Thereafter, in 1888, the defendant employed one Hack-busch to run the east boundary of said tract. In the instructions issued to him by the Commisisoner of the General Land Office it was provided:
* * * The division line between the Creek Reservation and the ceded lands was surveyed and marked in the field (under the direction of the Indian Office) in 1871, by F. W. Bardwell, Civil and Topographical Engineer. I inclose herewith a copy of the field notes of ■ ■. .Bardwell’s survey of said divisional line from the Ca *567 nadian River to and across the’North Fork of the Canadian. It will be necessary for you to retrace the Bard-. well line from the point where the same intersects the north bank of the Canadian River to the point of intersection with the south bank of the North Fork of the Canadian River, and to carefully measure the distance between these points. This measurement is required in order that the exact distance may be ascertained, and that any error which may have occurred in the original survey may be eliminated, the length of this line being one of the elements for computing the position of the east boundary of the tract to be run and marked under your contract.
Having ascertained the points of intersection of the. Bardwell line with the north bank of the Canadian, and - south bank of the North Fork of the Canadian, and the exact distance between said points, as well as the ■ true course of the line, meander both rivers from said points down stream for quantity, that is, to such a distance that a due north and south line connecting said. meanders will include an area of 175,000 acres.
' Pursuant to these instructions, Hackbusch undertook to locate the Creek dividing line as run by Bardwell. According to his field notes he located on the north bank of the Canadian River in the south a cedar post which corresponded in all respects to the post described by Bardwell in his field, notes, and he also located Bardwell’s 4-mile corner, and also his 38-mile and 40-mile corners, but he was unable to locate . any other monuments. His retracement of the Bardwell line ran in a straight line from the starting point on the Canadian River through the 4-mile corner to the 38-mile and 40-mile corners, the latter two of which were just north of the North Fork of the Canadian River. This retracement, however, is to the west of the Bardwell line as shown by the Bardwell field notes. On the Canadian River it is 34.65 chains to the west thereof and gradually converges therewith at the 38-mile corner.
This Hackbusch survey was examined in the field by H. B. Martin, Examiner of Surveys in the General Land Office, said by the Acting Commissioner of the General Land Office to be “the best examiner of surveys ever employed by this office,” who verified it in all particulars, saying, “this survey taken as a whole is a model of excellence.” Later it was *568 approved by the General Land Office. A. D. Kidder in his report, mentioned in the next paragraph, says, “The accuracy [of this survey] is far above the average of the land surveying practice of that date.”
While the present case was pending the Department of Justice, with the consent of the plaintiff, requested the General Land Office to make a field examination with respect to the location of the “Creek dividing line.” This investigation was made by Arthur D. Kidder, District Cadastral Engineer, who reported to the Commissioner of the General Land Office on March 18, 1941, showing the location on the map of the Hackbusch retracement of the Bardwell line and of the Bardwell line as shown by Bardwell’s field notes. According to his report, the area included in the tract to the east of the Bardwell line as shown by Bardwell’s field notes is 171,567 acres, and the area included to the east of the Hackbusch retracement of the Bardwell line is 176,198.99 acres. If the Bardwell line, as located by the Bardwell field notes, is to be treated as the true Creek dividing line, then there has been included in the 175,000-acre' tract an acreage less than the total acreage purchased from the Creeks. But, on the other hand, if the true Creek dividing line is not that shown by Bardwell’s field notes, but is the Bardwell line as retraced by Hackbusch, then there has been included in the tract 176,198.99 "acres, or 1,198.99 acres more than was purchased from the Creeks. For these 1,198.99 acres the. plaintiff has not been compensated.
The Bardwell line as shown by his field notes is to the east . of his. line as retraced by Hackbusch, for the reason that his field notes fix the starting point on the Canadian River, at a point 20 miles and 64.43 chains to the east of the meridian of the mouth of Pond Creek; whereas, the starting point in Hackbusch’s retracement, the cedar post described in Bard-well’s field notes and located on the ground by Hackbusch, is 34.65 chains to the west thereof. The question then is, which . point shall be accepted as the true starting point- of the . Bardwell line, the place described in his field notes as 20 miles and 64.43 chains from the mouth of Pond Creek, or the. actual marker on the ground as located by Hackbusch.
*569 It is a well-established general rule that calls in a deed for natural objects or fixed artificial monuments control over calls for distances. United States v. State Investment Co., 264 U. S. 206; Spreckles v. Brown, 212 U. S. 208, 212; Higueras v. United States, 5 Wallace, 827, 835. In the last cited case it was said:
* * * where the lines are so short as evidently to be susceptible of entire accuracy in their measurement, and are defined in such a manner as to indicate an exercise of care in describing the premises, such a description is regarded with great confidence as a means of ascertaining what is intended to be conveyed. But ordinarily surveys are so loosely made, and so liable to be inaccurate, especially when made in rough or uneven land or forests, that the courses and distances given in the instrument are regarded as more or less uncertain, and always give place, in questions of doubt or discrepancy, to known monuments and boundaries referred to as identifying the land. Such monuments may be either natural or artifical objects, such as rivers, streams, springs, stakes, marked trees, fences, or buildings. '
So, in this case the actual marker on the ground, placed there by Bardwell, must control over the distance which Bardwell said this point was from a natural object more than 2ft miles away. Especially is this true with respect to this survey, since in several other instances the distances given by Bard-well’s field notes are shown to be inaccurate. For instance, the distance from the point of beginning to the 4-mile corner was 11.30 chains short of the actual distance measured by Hackbusch, and from the 4-mile corner to the 38-mile comer there was a discrepancy of 54,55 chains.
The true Bardwell line, therefore, is that line as retraced by Hackbusch. Kidder’s report shows that in the territory bounded by this line on the west and by the eastern boundary-established by Hackbusch there are 176,198.99 acres, or 1,198.99 more than the defendant has paid for.
II
But the defendant says that even though more than 175,000 ' acres were included in Hackbusch’s survey of the tract, nevertheless, the plaintiff is not entitled to recover because' of the *570 provisions of tbe agreement of January 19, 1889, between the Creeks and the defendant, ratified by Congress on March 1, 1889 (c. 317,25 Stat. 757). The pertinent parts of this agreement read as follows:
I. That said Muscogee (or Creek) Nation, in consideration of the sum of money hereinafter mentioned, hereby absolutely cedes and grants to the United States, without reservation or condition, full and complete title to the entire western half of the domain of the said Mus-cogee (or Creek) Nation lying west of the division line surveyed and established under the said treaty of eighteen hundred and sixty-six, and also grants and releases to the United States all and every claim, estate, right, or interest of any and every description in or to any and ' all land and territory whatever, except so much of the said former domain of the said Muscogee (or Creek) Nation as lies east of the said line of division, surveyed and established as aforesaid, and is now held and occu- . pied as the home of said nation.
Under this agreement the plaintiff granted to the defendant all of its lands— • .
* * * except so much of the said former domain of the said Muscogee (or Creek) Nation as lies east of the said line of division, surveyed and established as aforesaid, and is now held and occupied as the home of said nation.
It is clear that the plaintiff did not mean by this clause to . except from the grant the 175,0.00 acres ceded to the defend- . ant by the agreement of February 14, 1881, although these • lands lay “east of the said line of division.” It was the intention to except from the grant only such lands as lay “east of the said line of division” as were then “held and occupied as the home of said nation.” Except for the last ■qualifying phrase, the 175,000-acre tract would have been excepted from the grant. The defendant says that no part of the 176,198.99 acres included in the Hackbusch survey was “held and occupied as the home of” the Creek Nation when this agreement of 1889 Was entered into. The record shows this to be true in fact. Hackbusch in his field notes said:
This line (the east boundary of the Seminole), in accordance with special instructions, was run so far east of the Creek Dividing Line as to include an area of *571 175,000 acres. But the one hundred seventy-five thousand acres do not embrace all the lands now occupied by the Seminóles. Some valuable property remains east of the east boundary, such as the store and post office at We-wo-ka; the We-wo-ka mission; the store and post office at Arleka and several homesteads of the Indians. As near as I can estimate, not having a positive knowledge, it will take about twenty-five thousand acres more or less to include all the property of the Seminole Indians, which now remains east of the east boundary, as surveyed by me, under my contract of June 26,1888.
There is also other evidence in the record to show that the land occupied by the Seminóles was largely in excess of the 175,000 acres defendant purchased from the Creeks. We have, accordingly, found as a fact that the Creek- Nation on the date of the treaty of January 19, 1889, did not hold and occupy this excess of 1,198.99 acres as their home, and said lands were not, therefore, excepted from the grant to the United States.
At the time this treaty of 1889 was executed Hackbusch had run the eastern boundary of the 175,000-acre tract, and both the Creeks and the Seminóles at that time believed that the strip now in question was within the area granted to the Seminole tribe. When the agreement of 1889 was entered into, the parties intended that there should be conveyed all of the lands east of the Creek dividing line and up to the line as established by Hackbusch.
. It is true that the parties in executing this treaty acted under a mutual misapprehension of fact as to the proper location of the eastern boundary of the tract,'but not as to the lands actually occupied by the Creeks. We think it was for the precise reason that it was thought there might be some inaccuracy in the establishment of the eastern boundary of this tract that the parties limited the exception from the grant, not to any precise acreage east of the dividing line, but to such lands as were held and occupied as the home of the Creek Nation. Had they intended to limit the exception to the 175,000 acres, no more and no less, it would seem that this acreage would have been specifically mentioned.
*572 We are, therefore, of opinion that the plaintiff intended to grant to the United States the entire tract as surveyed by Hackbusch, although it later developed that this tract in fact included slightly more than the 175,000 acres.
It results that plaintiff is not entitled to recover and its petition will, therefore, be dismissed. It is so ordered.
MaddeN, Judge; JoNEs, Judge; LittletoN, Judge; and Whaley, Ghief Justice, concur.