CoweN, Chief Judge,
delivered the opinion of the court:
This is an appeal from a decision of the Indian Claims Commission granting appellee’s motion for summary judgment on the ground that appellant’s claim was res judicata, *486 having been, decided by this court in The Creek Nation v. United States, 93 Ct. Cl. 561 (1941).[1] Commissioner Scott dissented.
Appellant brought its suit before the Commission to recover the value of 1,198.99 acres of former Creek lands erroneously included in lands surveyed for the Seminole Tribe by appellee’s surveyor Hackbusch in 1888. Under Section 2, Clauses 3 and 5 of the Indian Claims Commission Act of 1946 (60 Stat. 1049), appellant seeks revision of an agreement between the Creeks and the United States.
In 1866, the United States Government, by treaty, obtained the western half of the Creek Nation’s domain in Oklahoma, and granted portions of this land west of the “Creek dividing line” to the Seminole Nation. When a survey of this “Creek dividing line” was finally made by the Government in 1871, it was discovered that the Seminóles had settled far to the east of this line on part of the Creek territory. In attempting to rectify this error, the Government entered into a treaty with the Creek Nation in 1881, whereby the United States purchased from the Creeks an additional 175,000 acres immediately east of the line as surveyed in 1871 for $175,000. When a survey was run in 1888 to establish the new eastern boundary, the Government surveyor Hackbusch included 176,198.99 acres instead of 175,000 in the new tract. All of this land, including the additional acreage, was allotted and patented to the Seminóles.
In 1889, the United States and the Creek Nation entered into an agreement, ratified by the Congress on March 1, 1889 (25 Stat. 757), which contained the following language:
I. That said Muscogee (or Creek) Nation, in consideration of the sum of money hereinafter mentioned, hereby absolutely cedes and grants to the United States, without reservation or condition, full and complete title to the entire western half of the domain of the said Muscogee (or Creek) Nation lying west of the division line surveyed and established under the said treaty of eighteen hundred and sixty-six, and also grants and releases to the United States all and every claim, estate, *487 right, or interest of any and every description or in to any and all land and territory whatever, except so much of the said former domain of the said Muscogee (or Creek) Nation as lies east of the said line of division, surveyed and established as aforesaid, and is now held and occupied as the home of said nation.
II. In consideration whereof, and of the covenant herein otherwise contained, the United States agree to pay to the said Muscogee (or Creek) Nation the sum of two million two hundred and eighty thousand eight hundred and fifty-seven dollars and ten cents, * * *.
The error in the Hackbusch survey of 1888 was not discovered until sometime in 1930.
The Creeks sued the United States in 1937, under the jurisdictional act of May 24, 1924 (43 Stat. 139, as amended, 50 Stat. 650 (1937)), asking just compensation for the 1,198.99 acres of land which were taken as a result of the erroneous survey of 1888. This court, under that jurisdictional act, denied recovery on the ground that the Creek Nation intended under the 1889 agreement to grant to the United States the title to all the land as surveyed and which was not a part of the Creek homeland, even though it later developed that the tract contained more acres than that contemplated by the 1881 agreement. The court found that none of the 1,198.99 acres was occupied as a part of the Creek homeland.
The sole question of our decision is whether summary judgment for appellee was proper under the circumstances of this case. The defense of res judicata may properly be presented in a motion for summary judgment and the Indian Claims Commission has jurisdiction to grant such a motion. Choctaw Nation v. United States, 128 Ct. Cl. 195, 121 F. Supp. 206 (1954). However, appellant contends that res judicata does not apply and that the decision of the Commission was in error, because the prior claim was presented under the limited scope of the 1924 jurisdictional act, whereas new causes of action are presented in the instant claim under the more liberal terms of the Indian Claims Commission Act of 1946.
*488 We have concluded that appellant’s contention must be sustained for two major reasons. First, the doctrine of res judicata in its strict sense is not involved here.
Second, although the defense of collateral estoppel is involved, compelling reasons exist for, holding that it is not a bar to appellant’s action under the circumstances.[2]
The leading case distinguishing collateral estoppel from res judicata, Commissioner v. Sunnen, 333 U.S. 586 (1948) teaches that res judicata applies when the same cause of action is urged the second time. The judgment in the prior case binds the parties and their privies and “puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatever, absent fraud or some other factor invalidating the judgment.” Commissioner v. Sunnen, supra, at 597.
However, when the cause of action upon which the second suit is brought is one which could not have been entertained in the prior suit, res judicata has no force and effect. The Chickasaw Nation v. United States, 132 Ct. Cl. 359 (1955). This court has many times noted that the Congress created new causes of action in the Indian Claims Commission Act, which recognized liability in the United States where none had existed before.[3] “In fact, the act clearly creates causes *489 of action and permits suits thereon which would not have been possible, and are not possible as far as we know, between private individuals.” Otoe and Missouri Tribe of Indians v. United States, 131 Ct. Cl. 593, 131 F. Supp. 265 (1955), cert. denied, 350 U.S. 848 (1955). To be specific, the Indian Claims Commission Act, Section 2, Clauses 3 and 5 (60 Stat. 1049), permits recovery as follows:
* * *(3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity; * * * and (5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity. * * *
Recovery under the 1924 jurisdictional act, containing language typical of special statutes, was not so broad. It gave authority to this court to hear and adjudicate “all legal and equitable claims arising or growing out of any treaty or agreement between the United States and the Creek Indian Nation or Tribe * * *” (43 Stat. 139).
Thus the Indian Claims Commission Act has done two things with regard to causes of action. First, it permits revision of treaties and agreements, whereas the court under the special acts was restricted to a construction or interpretation of the treaty or agreement to the extent that the interpretation was not inconsistent or in conflict with the terms of the treaty or agreement. Second, the act permits consideration of Indian claims under the broad scope of “fair *490 and honorable dealings,” a latitude again which the court lacked prior to passage of the act. Choctaw Nation v. United States, 318 U.S. 423 (1942).
When a claim is presented under either clause 3 or 5, section 2 of the act, and the defense of res judicata is interposed bj the Government, the Indian Claims Commission must compare the pleadings in the case with the prior decision and its jurisdictional act. Disregarding for the moment the question of identity of facts or issues, if it appears that the claim presented is one which could not have been reached by the court in the prior case, res judicata does not apply. This is so even though recovery could have been had for the Indians on some theory cognizable by the court at that time. Commissioner v. Sunnen, supra. As a practical matter, this means that few, if 'any, claims asserted under new causes of action created by the Indian Claims Commission Act can be barred by res judicata.
As we said in The Chickasaw Nation v. United States, 132 Ct. Cl. 359, 363 (1955) :
If we are to give effect to the purposes of the Indian Claims Commission Act, we cannot hold that a former decision finally adjudicated and barred causes of action which were not in existence when the prior decision was made.
This does not mean that the Commission must hear every claim brought under the act. It only means that the new causes of 'action should be recognized as the Congress intended them to be, and that the Commission should look beyond the pleadings to see whether the Indians have had their day in court on the specific issues and factual presentations urged in the second suit.[4] It is at this point that the more flexible doctrine of collateral estoppel comes into consideration. In Cromwell v. County of Sac, 94 U.S. 351, 353 (1876), this doctrine is explained as follows:
But where the second action between the same parties is upon a different claim or demand, the judgment in the *491 prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered. In all cases, therefore, where it is sought to apply the estoppel of a judgment rendered upon one’ cause of action to matters arising in a suit upon a different cause of action, the inquiry must always be as to the point or question actually litigated and determined in the original action, not what might have been thus litigated and determined. Only upon such matters is the judgment conclusive in another action.
Furthermore, “a subsequent modification in the significant facts or a change or development in the controlling legal principles may make [the prior] determination obsolete or erroneous, at least for future purposes.” Commissioner v. Sunnen, supra, at 599. This statement recognizes the fact that collateral estoppel is a judicially made doctrine that was developed in furtherance of a public policy against repetitious litigation. Hooper v. United States, 164 Ct. Cl. 151, 326 F. 2d 982, 985 (1964), cert. denied, 377 U.S. 977 (1964), citing Commissioner v. Sunnen, supra, and Baldwin v. Iowa State Traveling Men's Assn., 283 U.S. 522 (1931). “It is not meant to create vested rights in decisions that have become obsolete or erroneous with time * * Commissioner v. Sunnen, supra, at 599.
Has the Indian Claims Commission Act so changed “the legal atmosphere as to render, the rule of collateral estoppel inapplicable” id. at 600? We think that to a certain extent, and under certain circumstances, it has so changed the legal climate.
It is true that under the law prior to the act treaties with the Indians were to be construed more liberally than private agreements and, “so far as possible, in the sense in which the Indians understood them, and ‘in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people.’ ” Choctaw Nation v. United States, 318 U.S. 423 (1942). “But even Indian treaties cannot be rewritten or expanded beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties.” Id. at 432. In the Choctaw case, the Supreme Court reversed this court’s reliance on the lib *492 eral rules of construction in agreements between the United States and the Indians, where such reliance led this court to interpret a treaty to render it a fairer agreement and more nearly in accord with the subjective intentions of the representatives of the Indians. Subsequent to passage of the Indian Claims Commission Act, we reversed the Commission’s grant of appellee’s motion for summary judgment. The Commission had concluded that the Choctaw case was res judicata in an action brought by the Indians under the unilateral mistake provisions of clause 3, section 2 of the act, and under the “fair and honorable dealing” provisions of clause 5. The Chickasaw Nation v. United States, 132 Ct. Cl. 359.
The same set of circumstances occurred in earlier litigation over the meaning of a treaty in the case of United States v. Choctaw and Chickasaw Nation, 179 U.S. 494 (1900). The Supreme Court recognized that agreements with the Indians were to be interpreted in the sense in which they would naturally be understood by the Indians but reversed' this court’s judgment, 34 Ct. Cl. 17, saying at 179 U.S., pages 532-533:
But in no case has it been adjudged that the courts could by mere interpretation or in deference to its view as to what was right under all the circumstances, incorporate into an Indian treaty something that was inconsistent with the clear import of its words. It has never been held that the, obvious, palpable meaning of the words of an Indian treaty may be disregarded because, in the opinion of the court, that meaning may in a particular transaction work what it would regard as injustice to the Indians. That would be an intrusion upon the domain committed by the Constitution to the political departments of the Government.- Congress did not intend, when passing the act under which this litigation was inaugurated, to invest the Court of Claims or this court with authority to determine whether the United States had, in its treaty with the Indians, violated the principles of fair dealing.
The court further said at page 535:
* * * It is thus clear that the Court of Claims was without authority to determine the rights of parties upon the ground of mere justice or fairness, much less, under the *493 guise of interpretation, to depart from the plain import of the words of the treaty. Its duty was to ascertain the intent of the parties according to the established rules for the interpretation of treaties. Those rules, it is true, permit the relations between Indians and the United States to be taken into consideration. But if the words used in the treaty of 1866, reasonably interpreted, import beyond question an absolute, unconditional cession of the lands in question to the United States free from any trust, then the court cannot amend the treaty or refuse to carry out the intent of the parties, as gathered from the words used, merely because one party to it held the relation of an inferior and was politically dependent upon the other, or because in the judgment of the court the Indians may have been overreached. To hold otherwise would be practically to recognize an authority in the courts not only to reform or correct treaties, but to determine questions of mere policy in the treatment of the Indians which it is the function alone of the legislative branch of the Government to determine.
At the heart of the Indian Claims Commission Act is a recognition by the legislative branch of the Government that the special acts and existing facilities for adjudicating the claims of the Indians did not, in many instances, give the Indians a fair deal in their l’elations with the United States Government. The Congress acknowledged the moral obligation this Nation owes to its Indian quasi wards. These conclusions are evident in the legislative history of the act from its first inception as H.R. 7963, 71st Cong., 1st Sess. (1930) to the statement by the President in signing H.R. 4497, August 13,1946. It was emphasized in the hearings on the bill that this court had dismissed many Indian claims on purely legal grounds, since the special jurisdictional acts did not give this court the right to adjudicate the claims on the basis of moral obligations.[5]
The very act of creating a special tribimal as the Indian Claims Commission, rather than granting increased jurisdiction to the courts, in itself, reflects a change in the legal climate. Furthermore, the grant of authority to the Com *494 mission to determine whether the United States had, in its treaties and agreements with the Indian Tribes, violated the principles of fair dealings, and, where this appears, to revise and correct these treaties and agreements, certainly constitutes a change in the manner in which Indian claims are to be viewed.
It is argued that the Congress fully intended to reserve to the United States all defenses to a claim by the Indians (except laches and statute of limitations), including res judicata, and, inferentially, collateral estoppel.[6] This is true, but the reservation of such defenses must be considered in connection with the basic purpose and meaning of the Indian Claims Commission Act; emphasis on the reserved defenses should not defeat that basic purpose. Inherent in the defenses of res judicata and collateral estoppel are the limitations which preclude their applicability under certain circumstances in suits brought under the Indian Claims Commission Act. When Congress reserved these defenses, it also reserved considerations of their inapplicability. The subject of these defenses was much discussed by the Congress and others participating in writing the act. It is clear that one thing, and one thing only, was contemplated by the reservation in section 5: no issue should be heard again on its merits where a court has, in a prior suit, heard and considered all of the facts relating to that issue and has made a specific and definitive finding thereon. A fact once litigated and found is binding on the parties in a subsequent suit for revision of a treaty or agreement under the act. At times, this may mean that the whole cause of action fails because of the existence of such a finding; at other times it may mean that only a part of the claim is settled.
In claims brought under clause 5, based on “fair and honorable dealing,” the situation is different from that in which the Indians ask for a revision of a treaty or agreement *495 under clause 3. Since, under the Choctaw case, 318 U.S. 423, and Choctaw and Chickasaw Nation, 179 U.S. 494, the Indians could not have had their claims heard from the viewpoint of fair and honorable dealings, absent specific language in the jurisdictional act permitting this, the issue of such fairness could not have been considered by the courts prior to passage of the Indian Claims Commission Act. Although certain facts may have been decided by the court, the findings cannot raise an estoppel as to an issue not litigated. For example, a conclusive finding by the court in the former case as to the intent of the Indians in executing the agreement does not necessarily answer the question of fairness in the present case. Even if it be conceded that the Indians intended to convey the land in question, the act commands the Commission to examine all of the facts presented to determine whether, in the broad moral sense, the conduct of the Government in its dealings with the Indians was fair and honorable.
The Commission should make a preliminary determination as to whether a plea of unfair and dishonorable dealings raises a new and substantial issue that was not or could not be decided in prior litigation. Where the facts found in the prior litigation show on their face that the dealings were fair and honorable under the circumstances and no new and substantial factual question on the issue is raised, the Commission can, of course, entertain a motion for summary judgment on behalf of the Government. See the companion case decided today, Appeal No. 10-63, The Creek Nation v. United States post, p. 512. There are also cases in which the claim based on fair and honorable dealings was recognized by a rule of law or equity in prior litigation; in such cases, clause 5 has no application. Blackfeet and Gros Ventre Tribes v. United States, 127 Ct. Cl. 807, 818 (1954), cert. denied, 348 U.S. 835 (1954). In other instances, the act requires the Commission to hear the Indians’ claim of unfair and dishonorable dealings on the merits. Unless this be done, there is a failure to fulfill the objective of the act to give the Indians a full day in court on all issues not adjudicated by a competent body.
*496 We believe that our conclusion in this regard is supported by the legislative history.[7] Especially noteworthy is the statement made by Mr. Frank Chambers, a Department of Justice attorney, in response to questions from the Senate Committee on Indian Affairs regarding the Department’s suggested amendment giving section 5 its present wording, supra, note 6.
The CHAIRMAN. Let me ask you, Mr. Chambers: I understand you to say that this language in lines 13 and 14, “but all other defenses shall be available to the United States,” was not intended to set up a legal defense against an equitable claim.
Mr. Chambers. Against a moral claim. I would like to distinguish between equitable and moral, because of the possibility that “equitable” might relate to a claim in equity, say, under the Constitution; but against a moral claim my idea is that no legal defense would be good.
The ChaikmaN. So that no legal defense would be recognized against a claim based upon fair and honorable dealings that are not recognized by any existing rule of of law or equity ?
Mr. Chambers. That is correct.
In this case, the Creeks have not had their day in court on the question of intention with regard to the 1,198.99 acres of land in dispute. All this court decided in the prior case, 93 Ct. Cl. 561, was the intention of the parties as evidenced by the specific language of the agreement. The court did not decide the subjective intention of the Indians and the Government in light of the error in the survey. Since the court could not revise the agreement to reflect the intention of the parties, the court was compelled to give effect to the Government’s legal defense based upon the release contained in the agreement. Any other construction of the agreement would have run afoul of the terms of the agreement and the *497 Supreme Court cases cited supra. The court did find that “For these 1,198.99 acres the plaintiff has not been compensated,” 93 Ct. Cl. at 568; that the survey included “1,198.99 acres more than the defendant has paid for,” id. at 569; and that “it is true that the parties in executing this treaty acted under a mutual misapprehension of fact as to the proper location of the eastern boundary of the tract, but not as to the lands actually occupied by the Creeks,” id. at 571.
Our decision to return the case to the Commission for a hearing on the merits is buttressed by a decision of the Commission in which it considered the 1889 agreement, supra, and held that the subjective intention of the Indians was contrary to the express wording of the release. The Creek Nation v. United States, 2 Ind. Cls. Comm. 66 (1952). There the Commission specifically found that the consideration recited in the 1889 agreement went only to those lands in the Indian Territory conditionally ceded to the United States under the treaty of 1866, supra, and that “no part of the above consideration was paid or intended to be paid for the general release set forth in paragraph I of said Agreement of 1889 * * *”. 2 Ind. Cls. Comm, at 97. We are unable to agree that the ruling “relative to the intent of the parties to the 1889 agreement was not necessary to the decision in that case and, therefore, not controlling here.” 12 Ind. Cls. Comm. 54, 83 (1963). In the absence of the finding made in the 1952 case, it is difficult to see how the Commission could have reached its decision for the Indians (2 Ind. Cls. Comm. 66). Nor did this court’s decision reported in 93 Ct. Cl. 561 operate to invalidate the ruling made subsequently by the Commission under the provisions of the Indian Claims Commission Act, for the very reason that we find our 1941 decision in this case is not controlling today.
Appellee has urged that this case is controlled by our prior decisions in Choctaw Nation v. United States, 128 Ct. Cl. 195, 121 F. Supp. 206 (1954); Blackfeet and Gros Ventre Tribe v. United States, 127 Ct. Cl. 807, 119 F. Supp. 161 (1954), cert. denied, 348 U.S. 835 (1954); and Western (Old Settler) Cherokee Indians v. United States, 116 Ct. Cl. 665, 89 F. Supp. 1006 (1950), cert. denied, 340 U.S. 903 (1950). *498 In each of those cases (filed under the Indian Claims Commission Act), we upheld the Commission’s dismissal on the grounds that the doctrine of res judicata was applicable. Without reciting the details of each case, it is sufficient to note that in each the facts and issues presented were the same facts and issues that had been decided in prior cases. We acknowledge that this court was not as precise as it should have been in those cases, for in each the principles of collateral estoppel were involved and applied, even though it was called res judicata. With respect to our decisions sustaining the Commission’s holding on res judicata in Choctaw Nation v. United States, 133 Ct. Cl. 207 (1956), cert. denied, 352 U.S. 825 (1956) and Seminole Nation v. United States, 125 Ct. Cl. 375 (1953), we simply point out that in those cases the Supreme Court had in the prior cases considered and determined the question and issues; also, this court found that there was in fact no unfair or dishonorable dealing on the part of the Government.
For the reasons set forth above, we think: the Indian Claims Commission Act contemplated a hearing on the claim, either under section 2, clause 3, which permits revision of the agreement because of mutual or unilateral mistake, or under clause 5, which permits revision on grounds of fair and honorable dealing, or both. Therefore, the decision granting appellee’s motion for summary judgment is reversed and the cause is remanded to the Commission for further proceedings not inconsistent with this opinion.

Reversed and Remanded

 12 Ind. Cls. Comm. 54 (1963).

 Collateral estoppel is technically part of res judicata. As explained in Commissioner v. Sunnen, 333 U.S. 586 (1948), “* * * where the second action between the same parties is upon a different cause or demand, the principle of res judicata is applied much more narrowly. In this situation, the judgment in the prior action operates as an estoppel, not as to matters which might have been litigated and determined, but ‘only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered.’ [Citations omitted]. Since the cause of action involved in the second proceeding is not swallowed by the judgment in the prior suit, the parties are free to litigate points which were not at issue in the first proceeding, even though such points might have been tendered and decided at that time. But matters which were actually litigated and determined in the first proceeding cannot later be relitigated. Once a party has fought out a matter in litigation with the other party, he cannot later renew that duel. In this sense, res judicata is usually and more accurately referred to as estoppel by judgment, or collateral estoppel.” See also Max Bander v. United States, 161 Ct. Cl. 475 (1964);. As we shall subsequently point out, it is important to recognize the two- doctrines as distinct and separable. This distinction has not been preserved in some of our former opinions, even though correct results may have been reached. We take this opportunity to set the matter straight.

 United States v. Seminole Nation, 146 Ct. Cl. 171, 173 F. Supp. 784 (1959) ; in Otoe and Missouri Tribe of Indians v. United States, 131 Ct. Cl. 593 (1955), cert. denied, 350 U.S. 848, where this court discussed at some *489 length the history of the Indian Claims Commission Act, it was said at page 602 :
“The Indian Claims Commission Aet is both remedial legislation and special legislation. It broadens the Government’s consent to suit and as such is in derogation of its sovereignty. It confers special privileges upon the Indian claimants apart from the rest of the community, and to some extent is in derogation of the common law. This was, we think, because of the peculiar nature of the dealing between the Government and Indians from very early times. On the other hand, it remedies defects in the common law and in preexisting statutory law as those laws affected Indians, and it was designed to correct certain evils of long standing and well known to Congress.” See also Chickasaw Nation v. United States, 132 Ct. Cl. 359 (1955); Western (Old Settler) Cherokee Indians v. United States, 114 Ct. Cl. 716 (1949).

 In addition to the pleadings, the Commission may consider any depositions and admissions on file, plus affidavits accompanying a motion for summary judgment. Tlie Commission may also use its pretrial procedure, 25 CER § 503-22(e). Ct, Ct. Cl. Rules 43 and 44 (1964 Ed.).

 See the statement of Ernest L. Wilkinson, February 14, 1940, before the Senate Subcommittee of the Committee on the Judiciary on S. 3083, 76th Cong. 30 Sess. (1940), and the exhibit charts placed in the record.

 Section 5 of the Indian Claims Commission Act reads as follows:
“All claims hereunder may be heard and determined by the Commission notwithstanding any statute of limitations or laches, hut all other defenses shall be available to the united States.”

 See, e.g., Memorandum by the Assistant Solicitor, Department of the Interior, on amendments to H.R. 4497 (which passed in its amended form) proposed by the Department of Justice, April 22, 1946; testimony of Prank Chambers, attorney, Department of Justice, before the Senate Committee on Indian Affairs, July 13, 1946, on H.R. 4497, 79th Cong., 2d Sess. (1946) ; Supplemental Statement of House Managers on Indian Claims Commission Bill, 92 Cong. Rec. App. A 4923-4924 (August 12, 1946) ; Conference Report of July 27, 1946, on H.R. 4497, H. Rep. No. 2693, 79th Cong., 2d Sess., p. 6; Sen. Rep. No. 1715, 79th Cong., 2d Sess., p. 6 (July 15, 1946).