The **UNITED STATES** of America

v.

The **CREEK NATION.**

Appeal No. 8–72.

United States Court of Claims.

April 13, 1973.

Paul M. Niebell, Washington, D. C., attorney of record, for appellee.

Roberta Swartzendruber, Washington, D. C., with whom was Asst. Atty. Gen. Kent Frizzell, for appellant.

Before COWEN, Chief Judge, DURFEE, Senior Judge, and DAVIS, SKELTON, NICHOLS, KUNZIG and BENNETT, Judges.

DURFEE, Senior Judge.

The United States, defendant-appellant, has taken an interlocutory appeal from a decision and Interlocutory Order of the Indian Claims Commission, 26 Ind.Cl.Comm. 410 (1971), Commissioner Blue separately concurring and Commissioner Kuykendall dissenting.

In its petition plaintiff claimed additional compensation under Section 2, Clauses 3 or 5 of the Indian Claims Commission Act of 1946 for 5,200,000 acres of land in Alabama which it ceded to the United States by the Treaty of March 24, 1832, 7 Stat. 366. The Creeks have a compensable interest in the 5,-200,000 acres of land; title is not in issue.[1] The principal consideration for this land was some 2,187,200 acres of the same land reserved from the cession for the temporary use, and promised fee title possession (or value thereof), by individual Creek chiefs and family heads. Agreeing with plaintiff on both theories of recovery advanced, the Commission ruled that the United States as a matter of law was liable for the fair market value of the full 5,200,000 acres of land ceded, thereby holding appellant liable for the value of the 2,187,200 acres of the cession which were reserved for chiefs and family heads of the Creek Nation. The United States "is not objecting to paying the difference between the treaty consideration and fair market value of the 3,012,800 acres not returned to the individual Creeks."[2] Rather, appellant argues, and the dissenting opinion agrees, that the land which the treaty reserved to chiefs and family heads should have been excluded from the area for which the Comission granted compensation, and that plaintiff cannot claim additional compensation for these lands selected by individuals.

Two issues are presented: (1) whether the Commission erred in holding that the Creek claim with regard to the 2,-187,200 acres was not barred by collateral estoppel due to a prior decision, Creek Nation v. United States, 77 Ct.Cl. 226 (1933), based upon the Creek Jurisdictional Act of 1924, 43 Stat. 139; and (2) whether error was made in holding that the part of the claim disputed is not a composite of individual Indian claims but rather a tribal claim within

1. The United States admitted in its answer to plaintiff's petition, filed November 16, 1955 (Defendant's Answer, Second Defense, paragraph 10), that the Creeks had recognized title to the 5,200,000 acres.

2. Appellant's reply brief, p. 4.

the jurisdiction of the Commission and this court. We affirm.

Before considering the issues, it is necessary to state what this appeal does not involve. Appellant has not disputed any of the findings of the Commission on grounds of lack of substantial evidence. Therefore, we take these findings as conclusive to the extent not inconsistent with the findings in the 1933 Creek case as hereafter explained. Although the Government has argued that the legal conclusion of a lack of fair and honorable dealings is not supported by the facts, we find no merit to this argument given the findings of the Commission.

The history of the Creeks pertinent to our decision follows. In the year 1790 the Creek Nation exercised the right of occupancy over a wide area of land located in a part of the present States of Alabama, Georgia and Mississippi. Such right of occupancy was recognized by the United States.[3] By various treaties thereafter made the Creeks ceded most of their tribal domain to the United States, and in 1826 were confined to a comparatively small domain in eastern Alabama and western Georgia. By Treaty of January 24, 1826, proclaimed April 22, 1826,[4] the Creek Nation ceded to the United States all of its domain located in the State of Georgia. After the Treaty of 1826, these Indians were confined to a small domain in eastern Alabama, containing about 5,200,000 acres. As additional consideration for the cession of tribal lands in 1826, the United States agreed to purchase lands west of the Mississippi River where a portion of the Creek Nation intimated it would settle. About 1827 or 1828 some of the Creeks did move to and settle upon lands west of the Mississippi in Indian Territory assigned the Creek Nation along and between the Verdigris, Arkansas, and Canadian Rivers.

Thereafter, in the Federal Government's view "[t]he extension of the state laws of Alabama to include the Creek area and the influx of white settlors made it necessary that the (remaining) Creek Indians should remove west of the Mississippi."[5] At about this point in time begins the sequence of events which the Commission found determinative in establishing a lack of fair and honorable dealings, and afforded evidence of duress and unconscionable consideration.

In 1829 the State of Alabama, which had achieved statehood in 1819, extended its jurisdiction over the Creek country and divided the Indian land into counties. In 1831 the Alabama legislature incorporated a town within the Creek country as white men settled in Indian territory.

On the 16th of January 1832, the civil and criminal jurisdiction of Alabama was extended over all the Indian territory within her limits. The courts of revenue and roads were enjoined to establish such highways, bridges, and ferries, within the territory in which the Indians might live, as they should think the public good required. * * *

All laws and customs used, enjoyed, and practiced by the Creeks within the limits of the State, contrary to her constitution and laws, were abolished.

And it was further enacted that if the Indians should meet in council, and make any laws for the tribe contrary to the laws and constitution of Alabama, such Indians should, upon conviction, be imprisoned in the common jail of the county. * * *

These laws excited the animosity of all the Indians, but more especially that of the chiefs. They destroyed their oligarchical form of government, and struck down their power at a blow. * * * Roads were to be

3. Treaty of August 7, 1790; 7 Stat. 35, 2 Kapp. 25.

4. 7 Stat. 286; 2 Kapp. 264.

5. Defendant's Answer to plaintiff's Petition, p. 2, paragraph 10.

cut in every direction through their territory; white men were permitted to purchase and take possession of their improvements. * * * [6]

There is no doubt, and appellant has not disputed, that these intrusions by the State of Alabama were contrary to Federal law.[7] *Cf.* Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832). The Federal Government had ample authority under the intercourse law of March 30, 1802, 2 Stat. 139, to protect the Creek Nation from physical intrusion upon Creek lands by white settlers. Consistent with its own policy of Indian removal from the East, the Federal Government determined it would not oppose Alabama's actions. The press of white settlers to overtake Indian lands in the Eastern United States had found expression in a formal declaration of policy by Congress in the Act of May 28, 1830, 4 Stat. 411, that Indian tribes were to be removed from their ancestral homes in the East to lands west of the Mississippi River by seeking agreement of tribes for the exchange of their eastern lands for lands in the West. As a coercive inducement to obtain the agreement of the Creeks, the Federal Government told the Creeks that it was powerless to prevent the extension of the Alabama laws over (and as a consequence thereof the influx of white settlers into) Creek lands. Secretary of War John H. Eaton on May 30, 1829, instructed General William Carroll in this manner:

A crisis in our Indian affairs has arrived. Strong indications are seen of this in the circumstances of the legislatures of Georgia and Alabama extending their laws over the Indians within their respective limits. * * * The President is of the opinion that the only mode left for the Indians to escape the effects of such enactments, and consequences more destructive, and which are consequent on their contiguity to the whites, is *for them to emigrate.* * * *

* * * * * *

* * * [A]scertain upon whom, as pivots, the will of the Cherokees and Creeks turns. * * * Open to each a view of his danger and the danger that threatens his people. This may be made up of references * * * to the inefficiency of their own laws for their advancement; and *finally, to the fact that these will be superseded and trodden under by the exercise over them of the laws of the States.* [Emphasis added.][8]

Further evidence of this misrepresentation, tantamount to duress, which propelled the Creeks toward giving up the bulk of their remaining tribal lands, is contained in a letter dated November 1, 1831, from Secretary of War Lewis Cass to the Creek Chiefs:

Your great father, the President, has not unlimited power. He is bound by the Constitution and laws, and after examining these, he is satisfied, that he can not prevent the States from this exercise of their authority. So long, however, as they refrained from doing this, the General Government took charge of your whole concerns. But the State of Alabama having now included you in the great mass of her citizens, I trust you will yield careful obedience to her laws.[9]

It should be remembered that the Creeks who had remained in Alabama after 1828 had a fixed intention to remain there rather than move West. The Alabama land was the last enclave of ancestral lands left to the Creeks and the

6. Report of A. Balch, Commissioner on the causes of the Creek hostilities, to Benjamin F. Butler, Secretary of War, January 14, 1837, Cong.Doc.Series #304, 24th Cong., 2d Sess., H.Ex.Doc. #154 at 9–10. See Finding 3, 26 Ind.Cl.Comm. at 458–459.

7. Finding 4, 26 Ind.Cl.Comm. 410, 459.

8. Id. at 459–461, quoting from Indian Office Letter Book No. 5, Series 2, at 456–459.

9. Finding 5, 26 Ind.Cl.Comm. 410, 461, quoting from Indian Office Letter Book No. 7, Series 2, at 447.

religious significance of the land cemented the Creek intention to remain there. In April 1831 the Creek Chiefs wrote to the Secretary of War:

> With considerable reluctance, we have been compelled to refuse a compliance with his (the President's) wishes toward removing to the west; our aged fathers and mothers beseech us to remain upon the land that gave us birth, where the bones of their kindred are buried, so that when they die they may mingle their ashes together. They view a removal as the worst evil that can befall them.[10]

In December 1831 the Creeks sent a delegation to Washington to request that white intruders be removed and that the laws of Alabama not operate over them. They received no relief.

In an apparent concession to the steadfast intention of the Creeks to remain in Alabama, the *Federal Government advanced the idea to the Creek Chiefs* that each chief and each Creek head of family in Alabama would be given fee simple title to separate sections of the ancestral lands. This idea of promising fee title to individual members of the tribe in return for a tribal cession of the 5,200,000 acres was the outgrowth of the strategy of removal first enunciated by President Andrew Jackson in an address to the Creeks on March 23, 1829, when he said:

> I have sent my agent and your friend, Col. Crowell, * * * to consult with you upon the subject of your removing to the land I have provided for you west of the Mississippi. * * * Should any incline to remain and come under the laws of Alabama, land will be laid off for them and their families in fee.[11]

Col. John Crowell, who had the confidence of the Creek Chiefs, discussed the presentation to the Creeks of the idea of individual reservations in a letter to Secretary of War Cass, dated January 25, 1832:

> Sir: I had an interview with the two head chiefs of this (Creek) nation yesterday and explained to them fully (as I have frequently done) their situation; and as they still seemed determined not to come into any arrangement with the Government, which had for its object their removal west of the Mississippi, *I advised them to make a proposition to the Government for reservations of land to be granted to the heads of each family in fee, as the only mode by which they could be protected where they now are;* * * * [Emphasis added.] [12]

The Creek Nation acquiesced in the individual reserve arrangement only because, in the words of the Commission, " * * * it anticipated that the provision for individual reservations would allow tribal members to remain on land which they held sacred." 26 Ind.Cl. Comm. 410, 465. Indian Agent Crowell wrote to Secretary of War Cass on March 20, 1832:

> I have been in council with the delegation, and explained your basis of an arrangement in relation to reservations, and at one time had lost all hope of getting them to agree to anything like your propositions; but they have finally come to the conclusion that they will agree to *your basis in relation to reserves,* * * * [Emphasis added.][13]

The treaty was concluded on March 24, 1832, 7 Stat. 366, and was ratified and proclaimed on April 4, 1832, from

---

10. Finding 7, 26 Ind.Cl.Comm. 410, 465, quoting from S.Doc.No.512, 23rd Cong., 2d Sess., Vol. II, at 424 (1835).

11. Plaintiff's Exhibit 1, Indian Office Letter Book No. 5, Series 2, at 375. Footnote 7, *supra.*

12. Finding 5, 26 Ind.Cl.Comm. 410, 462, quoting from Plaintiff's Exhibit 1; Creek Nation v. United States, Ct.Cl. No. L–168, Call Papers, at 27.

13. Finding 5, 26 Ind.Cl.Comm. 410, 462–463, quoting from Plaintiff's Exhibit 3; S.Doc.No.512, 23rd Cong., 2d Sess., Vol. III, 269–270 (1835).

which date it became effective. The most important provisions follow:

*Article I.* The Creek tribe of Indians cede to the United States all of their land, East of the Mississippi river.

*Article II.* The United States engage to survey the said land as soon as the same can be conveniently done, after the ratification of this treaty, and when the same is surveyed to allow ninety principal Chiefs of the Creek tribe to select one section each, and every other head of a Creek family to select one half section each, which tracts shall be reserved from sale for their use for the term of five years, unless sooner disposed of by them. A census of these persons shall be taken under the direction of the President and the selections shall be made so as to include the improvements of each person within his selection, if the same can be so made, and if not, then all the persons belonging to the same town, entitled to selections, and who cannot make the same, so as to include their improvements, shall take them in one body in a proper form. And twenty sections shall be selected, under the direction of the President for the orphan children of the Creeks, and divided and retained or sold for their benefit as the President may direct. Provided however that no selections or locations under this treaty shall be so made as to include the agency reserve.

*Article III.* These tracts may be conveyed by the persons selecting the same, to any other persons for a fair consideration, in such manner as the President may direct. The contract shall be certified by some person appointed for that purpose by the President, but shall not be valid 'till the President approves the same. A title shall be given by the United States on the completion of the payment.

*Article IV.* At the end of five years all the Creeks entitled to these selections and desirous of remaining

shall receive patents therefor in fee simple, from the United States.

*Article V.* All intruders upon the country hereby ceded shall be removed therefrom in the same manner as intruders may be removed by law from other public land until the country is surveyed, and the selections made; excepting however from this provision those white persons who have made their own improvements, and not expelled the Creeks from theirs. Such persons may remain 'till their crops are gathered. After the country is surveyed and the selections made, this article shall not operate upon that part of it not included in such selections. But intruders shall, in the manner before described, be removed from these selections for the term of five years from the ratification of this treaty, or until the same are conveyed to white persons.

\* \* \* \* \* \*

*Article XII.* The United States are desirous that the Creeks should remove to the country west of the Mississippi, and join their countrymen there; and for this purpose it is agreed, that as fast as the Creeks are prepared to emigrate, they shall be removed at the expense of the United States, and shall receive subsistence while upon the journey, and for one year after their arrival at their new homes—*Provided however*, that this article shall not be construed so as to compel any Creek Indian to emigrate, but they shall be free to go or stay, as they please.

It should be noted that Article II of the Treaty does not give outright fee title to each chief or family head. Rather, Article II gives to each chief and family head the "use" of the selected section or half section for a term of five years with the option to sell, retaining the proceeds, and, according to Article III in the event of such a sale the seller of the tract is assured a "fair consideration." After five years of use, the individual Indian chief or family head would

receive fee title, assuming he had not sold the land.

After proclamation of the Treaty of April 4, 1832, the surveying and location of the Creek reserves began. Numerous intruders swarmed upon the land. Many Creeks were threatened away from their land by trespassers. "It does not appear, however, that the failure to remove these persons interfered seriously either with the survey of the land or the location of individual reserves to the Indians." Creek Nation v. United States, 77 Ct.Cl. 226, 252 (1933). In the 1933 *Creek* decision, *supra*, at 252, the court concluded:

> * * * Plaintiff's contention, therefore, that the failure of the Government to remove the intruders made the carrying out of the terms of the treaty an utter impossibility is not sustained in so far as Article II of the treaty is concerned.

Following the negotiation of the Treaty of 1832 speculators formed companies and entered the Creek country with a view to purchasing individual Indian reservations. Many schemes were used to obtain these reserves. Offices for the certification of sales of reserves were set up in October 1833, pursuant to Article III of the Treaty. Certifying agents began certifying contracts as soon as the locations were completed in 1834. Soon after they began their work, complaints were made that gross frauds were being practiced upon the Indians by speculators.

As the result of these complaints, in April 1834, R. J. Meigs, of Tennessee, was appointed by the direction of the President, to make a general investigation of the frauds in the sale of the Creek reserves. Meigs' investigation confirmed the former reports of citizens and Government officials within the Creek country, that great frauds had been perpetrated against the Indians in the sale of their lands. In his final report to the Secretary of War, dated November 12, 1834, Meigs stated:

[T]he frauds complained of, admit of the following classifications:

1. The reserves have sold, in some instances, without ever having seen their lands, believing that they never would be shown them, and fearing that none had been assigned them.

2. Some have been persuaded to sign a paper to enable a pretender friend to guard them against being cheated, which paper was nothing less than a deed. They have been induced to have these papers certified by the representation, that they would not answer the avowed purpose without the agent's certificate. And they have been persuaded, when the agent should put the question—'Have you sold your land?' —to answer affirmatively, as this was a mere formal question, which the agent must ask.

3. *In many cases*, the reservee's signature has been procured, while he was drunk, a few dollars in cash or goods being given him to bind the bargain, and when sober, he has been made to believe, that when an Indian puts his hand to paper, he is obliged to have it certified.

*Note.*—in Dr. McHenry's office, if the person, who procures a signature, enters his name on the books as a purchaser, the Indian is not permitted to sell to any other, nor are others permitted to bid. This is the main engine, by which the purchaser is enabled to convince the Indian that he is bound to consummate a contract when his signature has been once procured. And that it is a most powerful engine of fraud, a man must be excessively blind not to perceive.

4. Some reservees have been allured by all those means usually resorted to, to contract debts in the stores, and then frightened by threats of imprisonment, etc., to sign deeds for the sale of their lands, for insufficient prices.

5. Some have sold for inadequate prices, on promises that they should have what the land should be valued

to; and then the purchaser procures a valuation to be made by his own tools.

6. The money delivered to the Indian in the presence of the agent has been taken back, by the purchaser, by violence or fraud, and always secretly.[14] [Emphasis added.]

The court in the 1933 *Creek* case focused on two *kinds* of frauds:

\* \* \* The investigations revealed that many fraudulent practices had been resorted to by purchasers in procuring contracts of sale, the two principal methods through which most of the frauds were consummated being: (1) By taking the true Indian owner of a reserve before the agent, presenting a contract of sale for a fair consideration, paying the purchase money to the Indian in the presence of the agent, the money so paid being afterwards obtained from the Indian by fraud or force of the pretended purchaser, and (2) by taking an Indian who had sold his land, or had never owned any, before the agent and having him impersonate the real owner of a reservation, and thereby procure the certification of a contract of sale \* \* \*. 77 Ct.Cl. at 253, 254.

The certification of sales was suspended, investigations of the frauds followed and numerous contracts were cancelled. Hostilities on the part of the Indians in the spring of 1836 terminated completion of the investigation, cancellation, and recertification. The sequel is well recorded in the findings of fact XIII and XIV of the court in the 1933 *Creek* case, *supra*, at 243–244:

XIII. \* \* \* A majority of the Creeks remained friendly and took no part in the hostilities against the whites, but the depredations committed by those unfriendly were so extensive and the difficulty of restoring and maintaining law and order so great, that the *Federal Government decided it was necessary to remove the whole Nation to its country west of the Mississippi River*, and with the exception of about 600 Creek warriors who had enlisted in the Federal service against the Seminoles, and the families of such warriors, the whole tribe, under a military escort, was removed during the summer and fall of 1836. *These warriors and their families were removed to the West after the termination of Seminole hostilities in 1837.*

XIV. Immediately after hostilities in the Creek country had subsided, Thomas H. Crawford and Alfred Balch were commissioned under a House resolution to investigate "the causes of hostilities" and "any other transactions connected with the contracts for the sale of Creek lands," and to make "the inquiries necessary to do justice to the Indians and to the parties claiming to have purchased their lands." \* \* \* Commissioners Crawford and Balch were instructed "to include in their report only the cases in which they have instituted inquiries into unapproved contracts, on representations, or their belief of fraud in the original contracts," and that they take cognizance in approved contracts "only when specific allegations of fraud in a particular contract are made to them by respectable persons."

\* \* \* The great body of Indians having already emigrated, Commissioners Crawford and Balch were largely limited in their inquiries to the testimony of white men residing in the country who were acquainted with the general facts and circumstances under which sales were made in the winter of 1835, when the impersonation frauds reached their height. The testimony heard by them was as a rule more general in its character then directed to specific cases. They investigated and adjudicated more than 1,000 cases and made recommendations in respect to each of them. Their reports confirmed the

14. Finding 14, 26 Ind.Cl.Comm. at 472–473.

findings previously made by certifying agents, by Colonel Hogan, and other investigators, that glaring frauds had been perpetrated on the Indians in the sale of their reserves. [Emphasis added.]

Because of the removal of the Creek Indians to the West and their consequent inability to sell their reserves, and the reserves of deceased Creek Indians, the Act of March 3, 1837, 5 Stat. 186, was passed. This Act provided:

That the President of the United States may, and he is hereby authorized to, cause all the reserves belonging to the Creek Indians by virtue of the provisions of the treaty of March twenty-fourth, eighteen hundred and thirty-two, which shall remain unsold on the fourth day of April next, to be sold at public auction in the Creek country; after giving at least sixty days notice of the time, place, and terms of sale in the public prints, and to cause patents to be issued to the purchasers of said reserves.

The Act of 1837 provided that the proceeds from the sale at auction of each reserve were to go to the Indian entitled thereto.

## I. COLLATERAL ESTOPPEL ISSUE

█ It has been noted that the Treaty of 1832 is the subject of a former decision of the Court of Claims in Creek Nation v. United States, 77 Ct.Cl. 226 (1933). That decision is res judicata as to legal or equitable claims which could have been brought in the Court of Claims under the Creek Jurisdictional Act of 1924, 43 Stat. 139. See Blackfeet and Gros Ventre Tribes v. United States, 127 Ct.Cl. 807, 119 F.Supp. 161, cert. denied, 348 U.S. 835, 75 S.Ct. 58, 99 L.Ed. 658 (1954); Choctaw Nation v. United States, 121 F.Supp. 206, 128 Ct. Cl. 195 (1954); Assiniboine Indian

Tribe v. United States, 121 F.Supp. 906, 128 Ct.Cl. 617, cert. denied, 348 U.S. 863, 75 S.Ct. 88, 99 L.Ed. 680 (1954). The claims which could be brought under the 1924 Act were limited:

* * * Jurisdiction be, and is hereby, conferred upon the Court of Claims * * * to hear, examine, and adjudicate and render judgment in any and all legal and equitable claims arising under or growing out of any treaty or agreement between the United States and the Creek Indian Nation * * *.[15]

In the instant case, plaintiff brought its action under Section 2, Clauses 3 and 5, of the Indian Claims Commission Act of 1946; these new causes of action did not exist under the 1924 Jurisdictional Act. United States v. Seminole Nation, 173 F.Supp. 784, 146 Ct.Cl. 171 (1959); Otoe and Missouria Tribe of Indians v. United States, 131 F.Supp. 265, 131 Ct. Cl. 593, cert. denied 350 U.S. 848, 76 S. Ct. 82, 100 L.Ed. 755 (1955); Western (Old Settler) Cherokee Indians v. United States, 114 Ct.Cl. 716 (1949).

Although the principle of res judicata does not bar plaintiff's action, Creek Nation v. United States, 168 Ct.Cl. 483, 490 (1964), appellant asserts that plaintiff is collaterally estopped as to certain factual issues determined and legal conclusions reached in the 1933 Creek decision and that such estoppel bars plaintiff from recovering under the new causes of action created by the 1946 Act.

The starting point of our inquiry is the Supreme Court's decision in Commissioner v. Sunnen, 333 U.S. 591, 597–598, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948), where collateral estoppel was distinguished from res judicata:

But where the second action between the same parties is upon a different cause or demand, the principle of res judicata is applied much more

15. *See* Creek Nation v. United States, 63 Ct.Cl. 270, 272, cert. denied, 274 U.S. 751, 47 S.Ct. 765, 71 L.Ed. 1332 (1927) for an analysis of the 1924 Jurisdictional Act. An act involving a different tribe but the same jurisdictional language is analyzed in Crow Tribe v. United States, 284 F.2d 361, 151 Ct.Cl. 281, 298–299 (1960).

narrowly. In this situation, the judgment in the prior action operates as an estoppel, not as to matters which might have been litigated and determined, but "only as to those matters in issue or points controverted, upon the determination of which the findings or verdict was rendered." (Citations omitted). * * * But matters which were actually litigated and determined in the first proceeding cannot later be relitigated. * * * In this sense, *res judicata* is usually and more accurately referred to as estoppel by judgment, or collateral estoppel.

■ The doctrine of collateral estoppel must be used with its limitations carefully in mind so as to avoid injustice. *Sunnen, supra*, at 599, 68 S.Ct. 715. The Supreme Court noted these limitations on the doctrine:

* * * [A] subsequent modification of the significant facts or a change or development in the controlling legal principles may make that [prior] determination obsolete or erroneous, at least for future purposes * * *. That principle [collateral estoppel] is designed to prevent repetitious lawsuits over matters which have once been decided and which have remained substantially static, factually and legally. It is not meant to create vested rights in decisions that have become obsolete or erroneous with time * * *. 333 U.S. at 599, 68 S.Ct. at 720.

In the 1964 *Creek* decision, *supra*, we had occasion to consider the collateral estoppel principles of *Sunnen* in relation to the effect of prior determinations under the Creek Jurisdictional Act of 1924 upon later claims brought under the Indian Claims Commission Act of 1946. We asked in that 1964 *Creek* decision, *supra*, 168 Ct.Cl. at 491:

Has the Indian Claims Commission Act so changed 'the legal atmosphere

as to render the rule of collateral estopped inapplicable.' [Sunnen] at 600 [68 S.Ct. 715]? We think that to a certain extent, and under certain circumstances, it has so changed the legal climate.

In the case now before us the "legal climate" has been changed so as to make collateral estoppel inapplicable. We agree with appellant that the fact that "treaty revision" and "fair and honorable dealings" were not, in so many words, statutory bases for recovery in the prior 1933 litigation between the parties does not, *ipso facto*, prevent the application of the doctrine of collateral estoppel in the instant case. But the creation of these new causes of action did raise new issues which were not, and to some extent need not be, actually litigated by the parties and necessary to the decision of the court in its 1933 *Creek* decision. Commissioner Kuykendall in his dissent from the Commission's decision miscast these issues as breach of treaty. 26 Ind.Cl.Comm. at 445. The new issues do not involve questions of the *breach* of the 1832 Treaty provisions, and the Commission's decision which we are now reviewing expressly disavowed resting upon an ultimate finding of a breach of treaty.[16]

■ In the 1933 *Creek* case the legal question was whether or not the United States had violated its 1832 Treaty obligations to the Creek Nation. In the 1933 case the " * * * matters in issue or points controverted, upon the determination of which the finding * * * was rendered"[17] were ultimately two in number: (1) whether the Government failed to remove white intruders from the Creek lands in violation of Article V of the Treaty with the result of vitiating Articles II and III of the Treaty and (2) whether the true allottees under the Treaty were defrauded and prevented from the "fair consideration" for sale of their allotment as

---

16. " * * * [O]ur result does not rest on finding a specific breach of the treaty." 26 Ind.Cl.Comm. 410, 416, n. 4.

17. Cromwell v. County of Sac, 94 U.S. 351, 353, 24 L.Ed. 195 (1876).

promised in Article III of the Treaty.[18] 77 Ct.Cl. at 249, 250. Plaintiff is estopped to relitigate *these* issues, and insofar as the Commission reconsidered these *issues* it erred. The classic statement of the applicable rule is found in Southern Pacific R. R. Co. v. United States, 168 U.S. 1, 48–49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897):

> The general principle announced in numerous cases is that a right, question, or fact distinctly put in issue, and directly determined by the court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent suit between the same parties or their privies; and, even if the second suit is for a different cause of action, the right, question, or fact once so determined must, as between the same parties or their privies, be taken as conclusively established, so long as the judgment in the first suit remains unmodified. * * *

*Accord Sunnen, supra,* 333 U.S. at 597–598, 68 S.Ct. 715 (1947); United States v. Munsingwear, Inc., 340 U.S. 36, 38, 71 S.Ct. 104, 95 L.Ed. 36 (1950); Partmar Corp. v. Paramount Pictures Theatres Corp., 347 U.S. 89, 101, 74 S.Ct. 414, 98 L.Ed. 532 (1954); Edgar v. United States, 171 F.Supp. 243, 145 Ct.Cl. 9, 12 (1959).

■ The ultimate issues involving intruders and frauds in providing fair consideration for the sale of allotments, as well as the underlying evidentiary or "mediate" findings necessary to resolution of these issues, do not, however, operate to collaterally estop plaintiff altogether.

Section 2, Clause 3, of the Indian Claims Commission Act permits " * * * claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity * * *." 25 U.S.C. § 70a. The Commission examined and found facts amounting to duress in the deceptions practiced upon the Creeks, funneling them towards treaty negotiation and acquiescence in, and eventually insistence upon, the individual reservations arrangement; the United States patently misrepresented that it was helpless in the face of Alabama exercising jurisdiction over the Creek lands and people.

The issue of duress and the evidentiary facts necessary to determination of this issue were not considered by the court in its 1933 *Creek* decision. Nor did the 1933 *Creek* decision address itself to the issue of unconscionable consideration beyond examination of the related but narrower question of whether the United States had met its Article III obligation that allottees receive in hand a "fair consideration" if they chose to sell their allotments. The court in 1933 did not consider whether the principal consideration, consisting of individual allotments to chiefs and family heads with an option to sell before a patent was issued, was conscionable in view of the foreknowledge of the United States that individually the allottees in reality would never get to keep their ancestral lands but would fall prey to speculators, who would frighten, dupe, drunken, or coerce them into selling and/or subsequently rob them of the purchase price. The Creeks were vulnerable individually, and the United States knew it.[19]

---

18. An issue which produced an altogether separate and alternative ground for the 1933 *Creek* decision was whether the Creek Nation had waived all tribal claims against the United States by the Treaty of 1856. 77 Ct.Cl. 226, 263. The parties do not raise this issue on appeal.

19. Report of T. Hartley Crawford on the frauds charged to have been perpetrated in the transfer of Creek Indian lands to J. R. Poinsett, Secretary of War, May 11, 1938. Cong.Doc. Series 331, 25th Cong., 2d Sess., H.Ex.Doc. #452 at 6–7. (Plaintiff's Exhibit 4).

The Commission found: "The United States knew that those (individual reserve and sale) provisions would not be effective to allow those Creeks who desired to remain in their homeland." [20] And a later investigator of Creek hostilities noted:

That provision of the treaty which principally concerns this report, which was the charter of Creek reservations, and the origin of all the difficulty that has fallen upon the Government and the Indians, relates to portions of the ceded territory set apart for Creek use, and formed the chief consideration of the cession. It was a most unfortunate stipulation, which it required no great foresight to see might give birth to dishonest practices, that the weakness of the Indian would make successful, and must be productive of embarrassment on every side. The apprehension was strongly entertained and expressed by the then Chief Magistrate, then whom no man was more capable of forming a correct judgment. The proposition was declined and opposed; objections, which subsequent events have shown to be too well founded, urged, but pressed in vain upon the deluded Creek, whose misguided pertinacity was doubtless, fortified by those who were looking forward to the consummation of the frauds their imaginations had even thus early devised. Expostulation was fruitless, and the Government was compelled to yield the only condition upon which the Creeks would negotiate.[21]

It should be remembered that it was the President of the United States who first proposed the idea of individual fee titles to the Creeks; and it was United States' Agent Crowell who first pressed the idea upon the Creeks. That the Creeks were later encouraged to give up all their lands and move west of the Mississippi because of the dangers inherent in the individual reservations proposal and that the Creeks insisted upon the individual reserves, does not mitigate the culpability of the United States in providing unconscionable consideration. It was the United States that had first firmly engendered in the unsophisticated Creeks " * * * the delusive hope that they would settle on their reserves, and cultivate and hold them for their own separate use like the whites." [22]

The 1933 *Creek* decision focused only on the midpoint between fraudulently induced sales and subsequent theft of the purchase price from the hapless Creek allottee. If at the time of the certification of the sale it appeared that the true owner of the allotment had received "fair consideration," then the United States had met its treaty obligations, and the 1933 court so found and concluded.

As to Investigator Meigs' recitation[23] of the way individual Indians after a sale were plied with whiskey, often by the purchaser himself, and " * * * gotten into a humor to be wheedled out of his money by a loan or otherwise * * *," the 1933 court said:

It was not within the power of the Government to protect the Indians from such fraudulent and deceptive practices, nor was there any liability on the part of the Government growing out of the Treaty to do so. * * * 77 Ct.Cl. at 254–255.

The court was quite right in saying that there was no liability under the terms of the treaty that the United States attempt to interdict such frauds. Moreover, the court was properly observing its own jurisdictional limitations by searching only for wrongs "arising under or growing out of any treaty or agreement." 43 Stat. 139. The Commission today is not limited to such a

---

20. Finding 24, 26 Ind.Cl.Comm. at 488.

21. Footnote, 19, *supra*, at 5.

22. Footnote 6, *supra*, at 11.

23. Plaintiff's Exhibit #1: Creek Nation v. United States, Ct.Cl. No. L–168, Call Papers, at 107.

narrow search nor is plaintiff thus limited in the issues it may (and did) raise. Any legal conclusions of the court in 1933 that the Government had done "all it could do" to protect the Creeks were made within the ambit of its jurisdictional limitations at that time.

Our decision in United States v. Creek Nation, 427 F.2d 743, 192 Ct.Cl. 425 (1970) buttresses our decision today. In that case we reversed the Commission and held that *res judicata* barred plaintiff as to litigating issues relating to a taking claim which *could have been brought* under a prior jurisdictional act. However, we affirmed the Commission in holding that the United States was liable under Clause 3 of Section 2 of the Indian Claims Commission Act where the Commission made findings on the theretofore unlitigated issue of mutual or of unilateral mistake.

In an unconscionable consideration claim on a cession treaty under Section 2, Clause 3, of the 1946 Act, the Commission compares the consideration promised by the treaty to the then fair market value of the cession to determine whether that consideration is conscionable. If not, the treaty is treated as revised so that its consideration matches the then fair market value, and judgment is entered for the difference in consideration received and value. *See* Nez Perce Tribe of Indians v. United States, 176 Ct.Cl. 815 (1966), cert. denied, 386 U.S. 984, 87 S.Ct. 1285, 18 L. Ed.2d 233 (1967); Osage Nation of Indians v. United States, 119 Ct.Cl. 592, 97 F.Supp. 381, cert. denied, 342 U.S. 896, 72 S.Ct. 230, 96 L.Ed. 672 (1951). We think the Commission properly found the consideration unconscionable under the facts and circumstances of this case, and it was not estopped from doing so.

Plaintiff's Section 2, Clause 5,[24] claim also raised new issues not heretofore passed upon. In regard to such a claim we have said:

In claims brought under clause 5, based on 'fair and honorable dealing,' the situation is different from that in which the Indians ask for a revision of a treaty or agreement under clause 3. Since, under the *Choctaw* [Choctaw Nation of Indians v. United States] case, 318 U.S. 423, 63 S.Ct. 672, 87 L.Ed. 877 and *Choctaw and Chickasaw Nation* [Choctaw and Chickasaw Nations v. United States], 179 U.S. 494, 21 S.Ct. 149, 45 L.Ed. 291, the Indians could not have had their claims heard from the viewpoint of fair and honorable dealings, absent specific language in the jurisdictional act permitting this, the issue of such fairness could not have been considered by the courts prior to passage of the Indian Claims Commission Act. *Although certain facts may have been decided by the court, the findings cannot raise an estoppel as to an issue not litigated.* * * * *[T]he act commands the Commission to examine all of the facts presented to determine whether in the broad moral sense, the conduct of the Government in its dealings with the Indians was fair and honorable.* [Emphasis added.] 168 Ct.Cl. 483, 494–495.

The Section 2, Clause 5, claim of plaintiff-appellee raised the issues, among others, of the bad faith treaty bargaining of the United States, abuse of fiduciary relationship, and broader questions of the morality of the entire course of conduct of the United States towards the Creeks, including the fairness of the eventual removal of all Creeks in 1837 before a single patent could be issued to any of them. Although some of the evidentiary findings of the court in its 1933 *Creek* decision bore upon the question of "fair and honorable deal-

---

24. "The Commission shall hear and determine the following claims against the United States on behalf of any Indian tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska: * * * and (5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity. * * *" 25 U.S.C. § 70a.

ings," such findings could " \* \* \* not raise an estoppel as to an issue not litigated. \* \* \* "

Appellant has suggested that our decision should be controlled by United States v. Creek Nation, 196 Ct.Cl. 639 (1971), cert. denied, 406 U.S. 929, 92 S. Ct. 1771, 32 L.Ed.2d 132 (1972), where we held the doctrine of collateral estoppel barred relitigation of issues previously litigated, relying on an earlier holding in Creek Nation v. United States, 168 Ct.Cl. 512 (1964). These cases are distinguishable. In 196 Ct.Cl. 639 and 168 Ct.Cl. 512, although the causes of action were new, the issues and facts advanced under the new causes of action had been thoroughly explored and disposed of in prior litigation. Plaintiffs in those cases had failed to demonstrate it had anything of substance in support of its new pleas that was not *offered, considered, and decided adversely to it* in the former actions.

 Appellant and the dissent of Commissioner Kuykendall have emphasized that the record in this case before the Commission and before us now is identical to the record before the court in 1933. The fact that the numerous documents offered and received in evidence are the same is alone not determinative of whether collateral estoppel applies. The parties and the court in 1933 did not focus on the configuration of evidentiary facts going to the issues raised by plaintiff through the "treaty revision" and "fair and honorable dealings" claims. The mere fact that such evidence was in the record in 1933 is not enough. The seminal test is:

> \* \* \* the judgment in the prior action operates as an estoppel, not as to matters which might have been litigated and determined, but "only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered." (Citation omitted). *Sunnen, supra,* 333 U.S. at 598, 68 S.Ct. at 719.

Commissioner Kuykendall in his dissent argued that the facts found in the prior litigation show on their face that the dealings were fair and honorable *and* no new and substantial factual question on the issue was raised, citing Creek Nation v. United States, 168 Ct. Cl. 483, 495 (1964). Therefore, he argues, estoppel results. We do not agree that the facts formerly found on their face establish fair and honorable dealings, and it is also clear that new and substantial factual questions concerning fair and honorable dealings have been raised.

## II. THE TRIBAL CLAIM ISSUE

Appellant contends that the 2,187,200 acres of individual reserves should be deducted from the 5,200,000 acres of Creek tribal lands ceded. Where reserves or grants to individual tribal members are bargained for by the tribe and are actually received by the reserves or grantees, they usually have been deducted from the acreage for which the tribe is to be compensated. Citizens Band of Potawatomi Indians v. United States, 391 F.2d 614, 179 Ct.Cl. 473, cert. denied, 389 U.S. 1046, 88 S.Ct. 771, 19 L.Ed.2d 839 (1968); Absentee Shawnee Tribe of Oklahoma v. United States, 165 Ct.Cl. 510 (1964); Cherokee Freedmen v. United States, 161 Ct.Cl. 787 (1963).

In ruling that a tribal claim with respect to the full 5,200,000 acres was presented, the Commission took cognizance of the fact that in this case, unlike *Potawatomi, supra,* there was not a bona fide attempt to settle individual Indians on allotment. 26 Ind.Cl.Comm. at 417. The Commission found, and we think properly concluded, that it was known, or should have been known, that the patents were not likely to vest in the Creeks.

Also in support of the result obtained in this case, the Commission relied upon one of its former decisions in Citizens Band of Potawatomi Indians v. United States, 14 Ind.Cl.Comm. 518, 566 (1964), where it said:

> [T]hese individual grants were a part of the over-all agreement embod-

ied in the treaty, and were necessary to its successful negotiation. In the absence of proof of any wrongdoing by defendant in making these individual grants, they will not be included in the area to be valued.

Thereafter, the Commission went on to say:

Testing the facts of the transaction in the present case against this rationale, the Commission finds such evidence of wrongdoing by the defendant, and therefore a different result is required. (Footnote omitted). 26 Ind.Cl.Comm. at 413.

■ Although we do not go as far as the Commission in its *Potawatomi* decision, *supra*, in holding that *"any* wrongdoing by defendant in making these individual grants" [Emphasis added] will require a different result, we hold that under the facts and circumstances of this case where the *whole* individual-reserves scheme constituted unconscionable treaty consideration, the tribe can present a valid claim under the Indian Claims Commission Act.

This is not a case where individuals are seeking compensation for frauds committed against them individually, such as in *Shawnee, supra*. The Shawnees did not complain of the treaty by which they ceded their lands to the United States, and the wrongs being complained of in *Shawnee* were confined to wrongs done "in inducing requests for allotment, or in the process of selection, allotment, and sale." *Shawnee, supra*, 165 Ct.Cl. at 516–517. And unlike *Shawnee*, the complaint in this case is not of "individual losses to separate members * * * who * * * were caused to give up their individual allotments for less than fair value." *Shawnee, supra*, at 515. Nor is this a case of individuals who are complaining of individual losses resulting from being omitted from the roll of allottees entitled to an allotment, such as in *Cherokee Freedmen, supra*. In that case the claims "were dependent upon the individual facts and circumstances pertinent to the

particular person * * *." *Cherokee Freedmen, supra*, 161 Ct.Cl. at 789.

As Commissioner Blue summarized in his concurring opinion:

The rights which have been allegedly violated are those of the tribe. The 5,200,000 acres involved was tribal property. The treaty by which it was ceded to the United States was negotiated by representatives of the tribe on behalf of the tribe. Although rights of individuals may also have been violated, the wrongdoings complained of were only to the tribe. 26 Ind.Cl. Comm. at 434.

The capstone is that with the Creeks, no individual member had an opportunity to secure a patent, as all were removed because of their tribal membership. 26 Ind.Cl.Comm. at 419.

We believe the Commission correctly concluded that a tribal claim for additional compensation was presented for the 5,200,000 acres of land ceded to the United States by the Treaty of 1832.

The Treaty will be deemed revised to eliminate the individual reserve provisions, and treated as a cession of the entire tract under Article I of the Treaty. This case should proceed to a determination of the fair market value of the entire 5,200,000 acres ceded by the Creeks. Defendant is entitled to an offset of other actual monetary consideration received by the tribe or its members as called for by the treaty.

Affirmed.

SKELTON, Judge (dissenting):

In 1930 the plaintiff, Creek Nation, sued the United States to recover the value of the identical 2,187,200 acres involved in this case upon practically the same grounds that it alleges here. In that case, Creek Nation v. United States, 77 Ct.Cl. 226 (1933), the plaintiff claimed that it had a legal and equitable claim against the United States for the value of this land because the government had not completely performed the duties it owed to the Creek Nation under the provisions of the treaty of 1832.

The present suit is maintained on the same record as the prior suit. There has been no additional evidence submitted. Nevertheless, the court, in connection with its construction of the Indian Claims Commission Act of 1946, is allowing the Creek Nation to recover the value of the same 2,187,200 acres of land involved in the 1933 suit, notwithstanding the fact that its claim for the value of this land was flatly rejected by the court in 1933. There are no new facts, no new evidence, nor any new questions here that were not presented in the prior case. We have new terms in the present case, such as "unconscionable consideration" and "fair and honorable dealings," but when these phrases are reduced to their basic meanings, it is clear, at least to me, that the same claims, in substance and effect, were made in the 1933 suit. The Congress could not have intended that such claims could be relitigated when it enacted the Indian Claims Commission Act. The court, in allowing the Creek Nation to recover in this case on claims that the court rejected in no uncertain terms 40 years ago, is, in my opinion, a reversal of its prior opinion without any new facts or issues that justifies such action after such a long lapse of time. Such a judgment will require the payment out of public funds of millions of dollars without justification under the facts or the law.

In the present suit, the Creek Nation bases its suit on two main claims, namely, (1) that the Indians who selected reserved tracts of land received "unconscionable consideration" for such land when it was sold by them to white settlers, and (2) that the Indians did not receive "fair and honorable dealings" from the government in connection with the sale by them of their tracts of land. A discussion of these claims follow.

The treaty of 1832 provided in Article III with reference to the consideration to be received by the Indians for the land involved here, in pertinent part, as follows:

*Article III*. These tracts may be conveyed by the persons selecting the same, to any other persons *for a fair consideration*, in such manner as the President may direct. The contract * * * shall not be valid 'till the President approves the same. * * * [Emphasis supplied.]

In the 1933 suit the plaintiff claimed that various individual Indians had been defrauded in the sale of their selected lands by white men by the use of various fraudulent schemes and devices, and that because the government did not prevent such practices, the Indians did not receive a "fair consideration" for their land and the government was liable for the value of the land. This court rejected this claim and denied recovery.

In the present suit the Indians are urging the same claim on the same facts. Admittedly, they couch their claim here in different words by saying they received an "unconscionable consideration" instead of failing to receive a "fair consideration." I see no basic difference between these terms. One has to engage in semantic reasoning to hold otherwise. If an Indian does not receive a fair consideration for his land, it must be concluded that the consideration was unfair. An unfair consideration paid to an Indian for his land is the same as an unconscionable consideration. Consequently, it is clear that this issue was alleged, raised and decided in the 1933 decision of this court. The plaintiff is collaterally estopped from again asserting it in this case.

The other ground relied on by the plaintiff for recovery in the present case is that the government did not engage in "fair and honorable dealings" with the Indians because it did not prevent the Indians from being defrauded out of their lands by the white settlers, and because of such neglect of duty the government is liable for the value of such lands. This same claim was made by the plaintiff in the 1933 suit, although the term "fair and honorable dealing" was not used in that litigation. The claim

was couched in different language in that case, but the meaning was the same. There the plaintiff claimed that the government had a duty under the treaty of 1832 to protect the Indians from fraudulent acts of white men in connection with the sale of Indian land, Treaty of 1832 to protect the Indians received a fair consideration for the sale of their lands. The plaintiff claimed that the government failed to carry out the provisions of the treaty in these respects and by reason thereof, did not deal fairly with the Indians and as a consequence, the government was liable for the value of the land. This court rejected this claim in the prior suit. The plaintiff is collaterally estopped from again alleging the same claim in the present case.

The facts found in the 1933 suit show that the dealings were fair and honorable and that the United States did everything it could to protect the Indians in the sale of their land to the white settlers. No new and substantial factual question has been raised on this issue in the present case. We held in Creek Nation v. United States, 168 Ct.Cl. 483, 495 (1964):

> * * * Where the facts found in the prior litigation show on their face that the dealings were fair and honorable under the circumstances and no new and substantial factual question on the issue is raised, the Commission can, of course, entertain a motion for summary judgment on behalf of the Government. * * *

The above-cited case states the correct rule, and, if applied here, it is dispositive of this issue in favor of the government. Nevertheless, the court by its process of semantic reasoning holds that the term "fair and honorable dealings" is somehow different to the claim asserted by the plaintiff and rejected by the court in the prior suit on this issue. I cannot agree. In the prior suit this court held:

> * * * It [The Creek Nation] has no legal or equitable claim of any kind

or character against the United States growing out of the treaty of 1832. * * * [77 Ct.Cl. at 263.]

This broad, comprehensive, and all inclusive decision of the court covered every legal or equitable claim "of any kind or character," and certainly included the claims now being asserted by the plaintiff, both as to "unconscionable consideration" as well as to "fair and honorable dealings." As stated above, the court has, in my opinion, engaged in an exercise of semantics to hold otherwise in the present suit.

The government contends in the present suit that the claim being asserted is not a tribal claim but is a claim of individual Indians. I think the government is right. The Creek Nation did not suffer any loss as a tribe when the individual Indians were defrauded in connection with the sale of their lands. The loss was that of the individual Indian and not a tribal one. We have often held that we do not have jurisdiction of the claims of individual Indians. That rule should be applied here. As a matter of fact, the Indian Claims Commission Act, 60 Stat. 1049, 25 U.S.C. §§ 70, 70a, 70i, denies jurisdiction to the Commission and to this court of claims of individual Indians. *See* Cherokee Freedmen v. United States, 161 Ct.Cl. 787 (1963); Minnesota Chippewa Tribe v. United States, 315 F.2d 906, 161 Ct. Cl. 258 (1963).

I agree completely with the dissenting opinion of the Honorable Jerome K. Kuykendall, Chairman of the Indian Claims Commission, in this case (26 Ind.Cl.Comm. 410), both as to the facts and the law. I have concluded that I cannot improve on his opinion, and, accordingly, I adopt it with minor changes, as the remainder of my dissenting opinion in this case as follows:

I cannot agree with the court's decision in this case that the Creek Nation is entitled to pursue an unconscionable consideration claim for 5,200,000 acres of Alabama Creek land ceded under the treaty of March 24, 1832, 7 Stat. 366, so

as to include the 2,187,200 acres that were reserved for individual Creeks who wished to remain in Alabama.

The prime issue of course is whether under our Act the United States can be held liable for the fair market value for this 2,187,200 acres of allotted lands when the record shows that, after the 1832 treaty had been concluded, many Creek Indians either did not receive a fair consideration in disposing of their allotments, or were euchred out of their lands by unscrupulous land speculators and other sharpsters. As the court sees it, the United States did not fulfill its 1832 treaty obligations to the Creek Nation because it failed adequately to protect Creek allottees from improvidently disposing of their lands. Thus, the court reasons, the sum total of all the unfortunate post treaty happenings resulted in a failure of the 1832 treaty consideration to the Creek Nation, and, therefore, the court can revise the 1832 treaty under sec. 2 clause 3 of our Act by ignoring the reserve provisions in Article 2 of the treaty and treating the reserve lands as having been ceded to the United States and, *ergo*, plaintiff is now free to pursue an unconscionable consideration claim, not only for the 3,012,800 acres ceded outright to the United States, but for the entire 5,200,000 acres. In the alternative, the court would allow recovery under sec. 2 clause 5 of the Act on the basis that the government's conduct toward the Creek Nation violated the standards of "fair and honorable dealings."

Forty years ago the Creek Nation filed suit in the Court of Claims to recover the value of the same 2,187,200 acres of reserve lands, and upon substantially the same grounds, namely, that the United States failed in its obli-gations to the Creeks under the 1832 treaty. In that 1933 case, Creek Nation v. United States, the Court of Claims, after entering detailed findings of fact and an opinion, concluded that the United States had fulfilled its 1832 treaty obligations, and that,

> * * * It [Creek Nation] has no legal or equitable claim of any kind or character against the United States growing out of the treaty of 1832. * * * [77 Ct.Cl. at 263.]

I do not suggest that the decision of the Court of Claims in the 1933 *Creek* case is a bar to the instant suit on grounds of *res judicata,* even though the record in the 1933 Creek case is the record in this case, and the parties are the same. However, I do suggest that certain factual determinations and legal conclusions made by the Court of Claims in the 1933 Creek case, do have an estoppel effect which the Commission was not at liberty to ignore.

Again, as it did in the 1933 *Creek* case, the plaintiff alleges as a basis for recovery that the defendant failed completely to perform the duties owed to its Indian ward, the Creek Nation, under the provisions of the 1832 Creek treaty. The alleged failure to perform is, according to the plaintiff, the direct result of many wrongful acts committed by the United States either before or after the conclusion of the 1832 treaty, all of which wrongful acts resulted in the loss of the Creek reserved area.

Where, as in this case, an area of land is reserved by treaty out of Indian tribal land that is ceded to the United States under the same instrument, it is treated as not being ceded, since the act of ceding and the act of reserving are contemporaneous.[1]

---

1. Citizen Band of Potawatomi Indians, 391 F.2d 614, 179 Ct.Cl. 473 (1967) aff'g in part, rev'g in part, Docket No. 217, 15 Ind.Cl.Comm. 232 (1965).

"* * * As to the 'grants' not located within the community, it has been the practice of the Indian Claims Commission not to include in the area for which com-pensation is to be allowed, lands which, though ceded to the United States under one provision of a treaty, were by subsequent treaty provisions to be granted by the United States to third parties. [Citations omitted.] With this practice we concur." *Id.* at 623, 179 Ct.Cl. at 490–491.

If the reserved area is a tribal reserve, then a tribal interest is maintained, and any subsequent disposition of this tribal area may, under the Indian Claims Commission Act, give rise to a separate cause of action by the tribe apart from any cause of action involving the ceded area. In this case we are not dealing with a tribal reserve, but with the individual reserves. Individual reserve areas are not the subject of communal ownership, but connote ownership in severalty.

The Court of Claims has already spoken on the matter of individual reserves, and the nature and substance of the interests that are involved. In the case of Absentee Shawnee Tribe v. United States,[2] the Shawnee Tribe, by the treaty of May 10, 1854, 10 Stat. 1053, ceded to the United States a large tract of land west of the State of Missouri, and the United States contemporaneously ceded back 200,000 acres to the Shawnees. Out of this 200,000 acres the Shawnees were to select and choose in the manner described in the treaty, individual tracts to be held in severalty. In a suit filed before the Commission it was alleged that, during the Civil War period, trespassers and intruders entered and occupied the Shawnee reserve area, and that the United States failed adequately to protect the Indians in their possession. It was further alleged that,

* * * [T]he Federal Government improperly induced and allowed these Indians to select individual allotments from the group land and sell their individual tracts to white settlers for a nominal consideration, and (v) as a result of these improprieties (including misfeasance by government agents) the Black Bob Indians were wrongfully deprived of their treaty land through this chain-process of selection, allotment, and sale. [Footnote omitted.] [165 Ct.Cl. at 514.]

The Court of Claims concluded that the Shawnee tribal claim seeks to redress individual wrongs as contrasted to a tribal injury, and that such individual wrongs are not compensable under the Indian Claims Commission Act. In summing up the court went on to say:

We come back, then, to the point that—since the right to select was vested, personal, and individual—any wrongs done in inducing requests for allotment, or in the process of selection, allotment, and sale, were individual and personal wrongs to the particular Shawnees who were bilked or defrauded. Improper inducement of an individual to exercise his right to an allotment might be an injury to him, but it would not trench upon any group rights; *a fortiori* the same can be said for improperly induced selections or sales. As a unit, Black Bob's Settlement had no more interest in these transactions than did the entire Shawnee Nation in the process by which the "severalty" Shawnees acquired and sold their individual allotments. See Ponca Tribe v. United States, 6 Ind.Cl.Comm. 409 (1958). Even if we were to find the defendant guilty of all the nonfeasance and malfeasance the petitioners assert, we would have to hold that the victims were the individual Shawnees, not the group as such. [165 Ct.Cl. at 516–17.]

I find little if anything of substance that would distinguish the facts and claims asserted in the Shawnee case from the Creek matter now before us.

The court and the plaintiff suggest that the instant case is different on various grounds, such as: it was wrong for the United States to negotiate for the removal of the Creek Nation to the Indian Territory in spite of the avowed removal policy of the government as enunciated under the Act of May 28, 1830;[3] it was wrong for the United States to

---

2. 165 Ct.Cl. 510 (1964) (aff'g, Docket 334–A, 12 Ind.Cl.Comm. 161 (1963), aff'g in part, rev'g in part, Docket 334–B, 12 Ind.Cl.Comm. 180 (1963)).

3. 4 Stat. 411.

misrepresent to the Creeks that Alabama had the authority to extend its laws over them; and, since the United States had obligated itself to the plaintiff tribe under the 1832 treaty "that its members would receive patents to their reserves or a fair consideration for them," it was wrong for the United States to conclude the 1832 treaty when the Government at all times knew the difficulties individual Creeks would encounter in handling their allotments.

The plaintiff herein has placed great emphasis upon the fact that the President had decided in the late 1820's that it was in the best interest of the Creek Nation to remove the tribe to a new home in the Indian territory. The passage of the 1830 Removal Act, *supra*, gave the President the authority to exchange Indian lands owned by the United States in any state for lands west of the Mississippi River not included in any state. The fact that in 1830 the United States, in an exercise of plenary power, declared by statute a new Indian policy, which on its face may offend or go contrary to the wishes of certain tribes, including the Creeks, does not in and of itself give the plaintiff tribe any claim or cause of action under our Act. Such new policy might set the stage, but it is only the execution of that policy that could infringe upon tribal rights. As Judge Davis so aptly observed in his concurring opinion in the case of Gila River Pima-Maricopa Indian Community v. United States:

\* \* \* But it would be wrong for judges to read into the Indian Claims Commission Act, passed almost twenty-five years ago, currents of thought which are emerging today but were not infused into that 1946 statute. The Act was not designed to grant compensation for all the detriment accruing to the Indians by our ongoing policy towards them but, rather, had the more limited goal of paying for specific deprivations of lands or property or rights protected by treaty, statute, or then-existing law. The instances cited in the Congressional history are of that kind. There is no intimation at all in the legislative background that the "fair and honorable dealings" clause was a catch-all allowing monetary redress for the general harm—psychological, social, cultural, economic—done the Indians by the historical national policy of semi-apartheid.[4]

Coupled with this removal policy the Commission insists that:

[I]n order to induce the Creeks to cede their lands, the Federal Government misrepresented to the Creeks the authority of Alabama to extend its laws over them.[5]

The matter of permitting individual Creeks to remain in Alabama first came to light in a talk to the Creek Nation by President Andrew Jackson on March 23, 1829. After recounting the increasing conflicts between the white settlers and the Indians, President Jackson advised the Creeks that he was sending his emissary Colonel John Crowell to consult with them upon the subject of their removal to the Indian territory where they could join that part of the Creek Nation that had already emigrated. President Jackson then went on to say:

I have instructed Colonel Crowell to speak the truth to you, and to assure you that your father, this President, will deal fairly and justly with you and whilst he feels a father's love for you, he advises your whole nation to go to the place where he can protect and foster you. Should any incline to remain and come under the laws of Alabama, land will be laid off for them and their families in fee.

My children, listen: My white children in Alabama have extended their law over your country. If you remain on it, you must be subject to that law.

---

4. 427 F.2d 1194, 1200, 190 Ct.Cl. 790, 802 (1970) (aff'g. Docket Nos. 236–K, et al., 20 Ind.Cl.Comm. 131 (1968)).

5. Commission's Finding 5.

If you remove across the Mississippi, you will be subject to your own laws and the care of your father, the President.[6]

It is obvious to me that President Jackson was discussing the problems of individual Creek Indians who desired to remain in Alabama. Whether or not Alabama could properly extend its laws over Creek tribal lands is irrelevant with respect to any Creek allottee who had the right to freely alienate his allotment or obtain a patent. A Creek allottee under the 1832 treaty did not hold tribal land; he was the sole owner, and, like any other individual Alabama land owner, he would be subject to Alabama laws. I do not read into President Jackson's statement that he was acknowledging or acquiescing in the extension of Alabama laws over *tribal lands* belonging to the Creek Nation. I see no case for misrepresentation. The fact of the matter is that the United States had already committed itself to the removal of the entire Creek Nation to the Indian territory where a portion had already emigrated pursuant to the Creek Treaty of January 24, 1826, 7 Stat. 286. In this instance the Government had no reason to challenge the right of Alabama to extend its jurisdiction.

I now reach the question of whether the United States fulfilled its 1832 treaty obligations to the Creeks, and I answer this in the affirmative by referring to certain conclusions reached by the Court of Claims in the 1933 *Creek* case.

The United States was well aware at the time of the 1832 treaty, that many of the potential Creek allottees, not being versed in the art of bargaining and selling real estate, would, if left to their own devices suffer dire consequences at the hands of white land speculators.

As the Court of Claims found and subsequently noted in its opinion in the 1933 *Creek* case:

* * * The commissioners who negotiated the treaty on the part of the Government foresaw the dangers, both to the Indians and to the Government, of the inclusion of this provision in the treaty, and expostulated in vain against it, but the Indians considered it the most important consideration in the treaty to them, and without the provision would not enter into the treaty. * * * [77 Ct.Cl. at 251]

The court then went on to say that, even after the 1832 treaty had been concluded, the United States tried unsuccessfully to negotiate a new treaty with the Creeks whereby the Indians would cede their reserves and the Government would "obligate" itself to sell the reserves in the open market at an early date and " * * * pay to each individual entitled to a section or half-section under the treaty of 1832, whatever his particular section or half-section should be sold for." [7] The Indians would not accept this proposition.

The plaintiff herein insists, as it did in the 1933 case, that the many intruders who moved into the Creek lands at the time of the 1832 treaty, made it virtually impossible for the United States to carry out its treaty obligations to the Creek Nation. In like manner the court in its opinion has emphasized how important it was to the Creeks that the United States remove all the intruders from the Creek lands. It is also clear from the record that the United States was unable to remove physically all the trespassers, squatters, and other interlopers who had flocked to the subject area.

The Court of Claims examined the record on this score, and concluded that the Government's failure to remove trespassers did not interfere seriously either with the survey of the land or the location of the individual reserves to the Indians, and that the,

* * * Plaintiff's contention, therefore, that the failure of the Govern-

---

6. Pl.Ex. 1, Printed record, Court of Claims, Creek Nation v. United States, 77 Ct.Cl. 226.

7. *Id.* at 252.

ment to remove the intruders made the carrying out of the terms of the treaty an utter impossibility is not sustained in so far as article II of the treaty is concerned. [77 Ct.Cl. at 252]

Article III of the 1832 treaty obligated the United States to approve only those contracts of sale which called for payment of a fair consideration to the Indian seller. The record herein shows that the United States promulgated rigid regulations governing such sales in order to insure, as far as possible, the payment of a fair consideration. Despite these regulations, frauds were perpetuated upon Indians by (1) either relieving the Indian seller of his money by fraud *after* the sales contract had been approved and the purchase money paid, or (2) impersonating the true Indian owner in order to obtain an approved contract of sale.

As to the first method of defrauding the Indians the Court of Claims had this to say:

It is not within the power of the Government to protect the Indians from such fraudulent and deceptive practices, nor was there any liability on the part of the Government growing out of the treaty to do so. The Indians, under the treaty, had the right to dispose of their reservations. The Government under article III of the treaty, obligated itself to protect them in the disposal of their reserves to the extent that they received a fair consideration for the same. The Government prohibited the sale of lands for less than, in the opinion of the certifying agents, they were worth, and saw to it that the Indians in all cases received the contract consideration for their lands. When the Government did this it did all that it could do, or that it was obligated to do, under article III of the treaty. What disposition individual Indians selling reserves made of the money received by them, subsequent to its receipt, was beyond the reach of the Government. The land belonged to the Indians and the money received by them from its sale was theirs, and after the money was paid to them and the conveyance approved, the Government had discharged its full obligation to the plaintiff under article III. [77 Ct.Cl. at 254–255.]

As to the second method of defrauding the Indians by impersonation, the Court of Claims on the record before us found that only a small percentage of the total contracts of sale were procured in this manner, and that the sales were subsequently set aside. [77 Ct.Cl. at 257.]

In my opinion the plaintiff is estopped in this case to deny many of the conclusions reached on the record by the Court of Claims in the 1933 *Creek* case, with respect to the Government's obligations under the 1832 treaty and its overall conduct and dealings with the Creek Nation and the Creek Indians during the negotiations and the carrying out of the provisions of the 1832 treaty—all of which matters bear heavily upon the question of whether the plaintiff can maintain in this case an "unconscionable consideration" claim for the reserve area under section 2 clause 3 of the Act, or a "fair and honorable dealings" claim under section 2 clause 5 of the Act.

The fact that "fair and honorable dealings" was not, in so many words, a statutory basis for recovery in the prior litigation between the parties [8] does not, *ipso facto*, prevent the application of the doctrine of collateral estoppel in the instant case.

The correct way to approach such a problem is set forth by the Court of Claims in Creek Nation v. United States, 168 Ct.Cl. 483 (1964) at page 495:

The Commission should make a preliminary determination as to whether a plea of unfair and dishonorable dealings raises a new and substantial issue that was not or could not be decided in prior litigation. Where the

---

8. Creek Nation v. United States, *supra*, 77 Ct.Cl. 226 (1933).

facts found in the prior litigation show on their face that the dealings were fair and honorable under the circumstances and no new and substantial factual question on the issue is raised, the Commission can, of course, entertain a motion for summary judgment on behalf of the Government. See the companion case decided today, Appeal No. 10–63, The Creek Nation v. United States post, p. 512. There are also cases in which the claim based on fair and honorable dealings was recognized by a rule of law or equity in prior litigation; in such cases, clause 5 has no application. Blackfeet and Gros Ventre Tribes v. United States [119 F.Supp. 161], 127 Ct.Cl. 807, 818 (1954), cert. denied, 348 U.S. 835 [75 S.Ct. 58, 99 L.Ed. 658] (1954). In other substances, the act requires the Commission to hear the Indians' claim of unfair and dishonorable dealings on the merits. Unless this be done, there is a failure to fulfill the objective of the act to give the Indians a full day in court on all issues not adjudicated by a competent body.

The facts found in the prior litigation show on their face that the dealings were fair and honorable under the circumstances and no new and substantial question on the issue has been raised. In fact the factual record now before us is the same record which was before the Court of Claims in the prior Creek case, *supra*.

The repeated and specific assertions of the Court of Claims that the government had acted in the best interest of the plaintiff at all times and had done all it could do to protect it and its members, prevent us from concluding otherwise.

Since there is no new evidence of record, and, since the plaintiff has had its day in court on the question of the defendant's 1832 treaty obligations to the Creek Indians with respect to the reserve lands, I would let the case go forward for determination of the fair market value of the 3,012,800 acres of land actually ceded by the Creek Nation under the 1832 treaty. I would deny any recovery by the Creek Nation of the value of the 2,187,200 acres involved in the case, and to that extent would reverse the decision of the Indian Claims Commission.

COWEN, Chief Judge, and BENNETT, Judge, join in the foregoing dissenting opinion.